49 437
1138 74

49 437
a189 1247
a189 2247

49 437
204 2232

## THIRD GRAND DIVISION.

APRIL TERM, 1863.

### *JOHN PHILLIPS

*v.*

### JOHN S. PHILLIPS.

1. PARTNERSHIP—*when it exists as to third persons.* Parties may so conduct themselves as to be liable to third persons as partners. when in fact no partnership exists as between themselves. The public are authorized to judge from appearances and professions, and are not bound to know the real facts.

2. SAME—*as between the parties themselves.* But a partnership can only exist as between the parties themselves, in pursuance of an express or implied agreement to which the minds of the parties have assented; the intention or even belief of one party alone, cannot create a partnership without the assent of the others.

---

*The publication of this case has been unavoidably delayed.

3. PRACTICE IN THE SUPREME COURT—*of retaining a case for further proceedings.* A bill in chancery was exhibited asking for the dissolution of an alleged partnership between the complainant and the defendants, and that an account be taken. On an appeal to the supreme court, it was held there was no partnership, but the court allowed the bill to be retained, in order that the question might be presented, whether such a state of facts appeared from the record, as would entitle the complainant to compensation on the principle of a *quantum meruit,* and to have the cause remanded with leave to amend the bill for that purpose.

APPEAL from the Circuit Court of Cook county ; the Hon. GEORGE MANIERRE, Judge, presiding.

This was a suit in chancery instituted in the court below by John S. Phillips, against John Phillips, and others. The bill alleges a partnership between the parties, asks that it may be dissolved, and for an account.

Upon the final hearing below, the court found that a partnership existed, and decreed that it be dissolved and an account taken.

The defendant, John Phillips, thereupon took this appeal. The only question presented is one of fact—whether a partnership did really exist.

Messrs. WOODBRIDGE & GRANT, for the appellant.

Mr. A. W. WINDETT, for the appellee.

Mr. CHIEF JUSTICE CATON delivered the opinion of the Court :

The only question in this case is one of fact. Was there a co-partnership between John Phillips and his four sons, or was he the sole proprietor of the business about which the controversy has arisen ? It must be remembered in the outset, that this is a controversy *inter sese,* and is not between third parties and the alleged members of the firm. Parties may so conduct

themselves as to be liable to third persons as partners when in fact no partnership exists as between between themselves. The public are authorized to judge from appearances and professions, and are not absolutely bound to know the real facts, while the certain truth is positively known to the alleged parties to a firm. A partnership can only exist in pursuance of an express or implied agreement to which the minds of the parties have assented. The intention or even belief of one party alone, cannot create a partnership without the assent of the others. If John S. Phillips designed and really believed that there was a partnership, but to which his father and brothers never assented, and in the existence of which they did not believe, then there was no partnership, unless, indeed, a co-partnership could be formed and conducted without their knowledge or consent. This would be simply absurd. We cannot in this way surprise them into a partnership of which they never dreamed.

Over twenty years ago John Phillips emigrated from Scotland and settled in Chicago with his family, consisting of a wife and four sons and two daughters. He was then very poor. He was a wood-turner by trade, and commenced that business in a very small way with a foot-lathe. He was frugal, industrious and honest, and prospered as but few men, even in this country, prosper. He labored hard with his own hands, and as his sons grew up they joined their work to his, all except John S., who, at a proper age was put as an apprentice to learn the chair-maker's trade, but his health proving delicate, his father made an arrangement with his master by which his time was released when he had but partially learned his trade, when John S. returned home and took a more or less active part in the business of his father. His health was, however, for many years, very delicate, and he was enabled to do but little physical labor. He, however, mostly took charge of the office and books, for which the testimony shows he was very well qualified, and where he rendered efficient service. In

the meantime, the business had grown from the smallest beginning, with a single foot-lathe, to a large manufactory, with extensive machinery propelled by steam; and chair-making, which was introduced at an early day, had become the principal or largest branch of the business. Thus this business was begun and continued and prospered, till 1860, when the complainant left his father and the business, and filed this bill for an account as among partners.

The business had always been conducted as it was begun, in the name of John Phillips, the father, although in a few instances bills were made out to John Phillips & Sons by persons with but a superficial acquaintance with them, which were paid without eliciting remark or particular attention. The books were all kept in the name of John Phillips, with the exception of a few entries made by a book-keeper in the name of John Phillips & Sons. Indeed, there is, and can be, no question that if there was a co-partnership embracing the father and sons, the firm name adopted was John Phillips.

The complainant, to show a co-partnership, proves that the sons all devoted their time and attention to the business after they attained their majority, without regular salaries as laborers or servants; that funds which they drew from the concern for their support were charged to each one separately, while neither ever received a credit for labor or services; that the father, upon one or two occasions, stated to third persons that his sons were interested in the business, and he also relies upon the appearances to the outside public, and the interest which all took in the success of the business.

For the defense, it is claimed, that, following the habits and customs of their forefathers in Scotland, the sons continued to serve the father in the same relation and with the same fidelity after attaining their majority as before, under the distinct and often declared understanding that all should belong to the father during his life, and at his death the business and

property should be left by him to his children, as he should think proper.

That this patriarchal system prevails to a much greater extent in Scotland than is familiar to us here is shown by the proof. This absolute control of the father over the property which is the fruit of the joint labor of the whole family, tends, undoubtedly, to accomplish one purpose, which was a cherished object with the father, and we may well believe was considered desirable by all, and that was, to keep the family together, and make all submissive and obedient to the father, as the head and owner, to whose discretion and will each must look for his proportion.

If such was the understanding and purpose of the parties, then there was no partnership. Originally, undoubtedly, the entire concern belonged to the father; and it so continued, unless by the agreement of the father the sons were admitted into the concern as partners; for, as before intimated, we know of no means by which the sons could become partners with the father, and thus acquire a title to his property, without his knowledge or consent. Did the father ever consent that his sons, or either of them, should be admitted as partners with him? Did he ever agree that they should be part owners of this property? On repeated occasions the subject of a co-partnership with his sons was presented to him, both in the presence of the complainant and his brothers, and he ever repudiated the suggestion in the most emphatic terms. The very suggestion, even, seemed to excite his indignation. Upon one occasion he expressed himself in this characteristic phrase: "Na, na! I will ha' nae sons for partners as long as I live. Damn them! they would put me out of the door." On none of these occasions do we find the complainant, or any of his brothers, claiming the existence of a co-partnership, but, on the contrary, they silently acquiesced in the assertions of the father.

56—49TH ILL.

But, to our minds, the controlling features of the evidence in this case consist in the testimony of the complainant himself, and his brothers. The testimony of Alexander A. C. Phillips, Kidzie and Peterson, shows that the complainant was repeatedly examined as a witness in cases between John Phillips and other parties, growing out of the business of the concern, and in all of these cases he swore that he was not a partner and had no interest in the concern. He then gave the same account of the relations between the father and sons which his brothers now give. Had there been a partnership he must have known it. If he had an interest in the business, he was then aware of it, and his denial of such partnership and interest must have been willfully false. There is no middle ground upon which he can stand in innocency, if there was a partnership. All his brothers, whom the complainant alleges in this bill were members of the firm, deny that there is, or ever has been, any co-partnership in this business, but that the father is the sole proprietor, and that none of the sons have any interest in the business other than an expectancy upon the death of the father. This expectancy is neither a legal nor an equitable interest, and yet it powerfully allies the expectants, in feeling, sympathy and effort, to the party or business from which they hope to realize their expectations. It often stimulates to long years of the most devoted service, as faithful and zealous as the most remunerative present reward.

That the complainant told the truth when thus examined, is testified to, as before stated, by all three of his brothers, in this cause, when they all stated that there was no such partnership as is alleged in the bill; that the entire business belonged solely to their father, in whose service they labored after they became of age the same as before, and that they had no interest in the business except what they might expect after his decease, and that entirely depended on his pleasure. They spoke what they must certainly have known. Had there ever

been any agreement, expressed or implied, that there should be a partnership, they, as parties to it, must have been aware of it. If not expressed in words, there must have been at least the mental intention and tacit understanding on the part of the father, that they should be admitted as partners, and on their part to assume the benefits and liabilities of partners, and this could not be without their knowledge. Others might be deceived by appearances. Others, ignorant of the customs and traditions of their forefathers, which are so fondly cherished by emigrants from the old country, and particularly from Scotland, might draw erroneous conclusions as to the true relation existing between them as a family, by seeing men in middle life zealously bending their energies under the guidance of their father to the promotion of the success of the business. Whoever should apply customs prevalent among native Americans to this state of facts would unhesitatingly conclude that all were in partnership. And so, no doubt, many were deceived, nor was it deemed necessary by any of the parties, on all occasions, to undeceive them by a full explanation of this family arrangement.

But the question here is, what was the actual fact, and not what observers supposed was the fact from appearances. It is the internal truth we are seeking, and these external appearances are only important as they may enable us to arrive at this truth; and when we so find the truth by indubitable proof in a different direction than that indicated by these external appearances, then these must go for naught. Here we have the positive testimony of every living man who has the absolute knowledge of the facts, including the complainant himself, all testifying most unqualifiedly that there was no partnership. And all these witnesses stand unimpeached, either directly or indirectly. True, in the appellee's argument, they are denounced in the most unmeasured terms. We, however, believe the witnesses, and we also believe that the complainant told the truth when he swore there was no

partnership, and believing this, the case is ended. If he did tell the truth, if his brothers have not committed corrupt perjury with him, then this decree was wrong, for there was no partnership. The law does not authorize us to discard this positive testimony unless we can show, from the record, sufficient reason for it. This we cannot do.

In the appellee's argument, filed *nunc pro tunc,* great complaint is made of the insufficiency and unfairness of the abstract, and had the appellee filed an amended abstract under the rule, setting forth fully the omitted portion of the record deemed important, it would have relieved us of much of the labor of this cause. The volume of testimony in the case is immense, to the great mass of which we cannot even allude in an opinion, but must content ourselves with stating our conclusions, barely alluding to some of the most vital of the proofs.

The decree is reversed and the bill dismissed.

*Decree reversed.*

---

At a term subsequent to that at which the foregoing opinion was filed, an application was made on behalf of the appellee for a re-hearing of this cause, which was denied, but the judgment previously entered in this court was so far modified as to allow the bill to be retained, in order that the complainant might present to the court the question whether the record showed such a state of facts as would entitle the complainant to compensation on the principle of a *quantum meruit,* and to an order of this court remanding the cause, with leave to amend the bill for that purpose. Finally, the complainant not availing himself of this privilege, the following additional opinion was filed:

PER CURIAM: This case was decided at the April term, 1863, and the decree of the court below reversed and the bill ordered

to stand dismissed. On a petition for a re-hearing, subsequently filed, the court was of opinion there was no sufficient grounds presented to justify the court in changing the judgment pronounced, but on our own suggestion, it was deemed proper to retain the bill, in order that the complainant therein, might present to the court the question, whether the record showed such a state of facts as would entitle the complainant to compensation on the principle of a *quantum meruit*, and to an order of this court remanding the case with leave to amend the bill for that purpose.

The complainant having failed to avail of this suggestion of the court, and we seeing no ground for a change of the opinion already pronounced, it is considered, that the decree of the court below be reversed and the bill dismissed.