Sara Patek, Complainant, v. Abraham H. Patek et al.,
Defendants.
Abraham H. Patek, Cross Complainant, Appellee, v.
Sara Patek, Cross Defendant, Appellant.

Gen. No. 35,094.

Opinion filed November 24, 1931.

KRINSKY, LEVITAN & GLASSNER, for appellant.

LUDWIG LOEWENSTEIN, for appellee.

MR. JUSTICE KERNER delivered the opinion of the
court.

Complainant, Sara Patek, filed her bill for an ac-
counting against Abraham H. Patek, Chicago Title &
Trust Company, as trustee, W. J. Newman and
Richard Barry. The defendant, Abraham H. Patek,
filed an amended cross-bill against the cross defendant,

Sarah Patek. Its essential averments are that in January, 1919, he came to live with Sara Patek and their two brothers; that he was of considerable assistance to his sister by his advice and counsel and that they were in the habit of confidence and harmony of interest in their mutual affairs and she frequently consulted him about her business affairs and troubles; that in February, 1920, he had considerable experience as a real estate broker, and she was possessed of a considerable sum of money and thereupon he, she, and their brother Jacob entered into an oral agreement to pool their capital and services, share and share alike, in buying and selling real estate; that she was to keep all accounts and books and handle all money, make all disbursements, sign all checks and documents necessary and take title to all property acquired in the joint enterprise; that Jacob was to superintend all construction, improvement and repairs; and that he was to maintain a downtown office, in touch with brokers and dealers, investigate and secure bargains, procure loans, manage all property acquired, except the collection of rents, arrange terms of purchase, close all deals and attend to all legal matters incidental to said business; that operations were commenced which resulted in profit to the enterprise and thereupon after the death of Jacob he (the cross complainant) and she entered into an oral agreement whereby he should undertake Jacob's duties in the enterprise and continue the enterprise and that they were to divide the profits equally between them; that from 1919 to 1925 the enterprise continued and by prudent investment and successful management of its profits by him she received a net income therefrom in the sum of $10,000; that she has collected all rents without accounting for same and that the present value of the property now standing in her name is $150,000; that he is justly entitled to a one-half interest in all the

property standing in her name; that he has at all times acted in good faith and that he is ready to do equity, and prays that she be held and decreed a trustee for him of the real estate standing in her name as belonging to the joint enterprise and partnership; that a resulting trust in his favor be decreed in said premises, and that their respective interests be ascertained and settled. After issues joined the cause was referred to a master to take the testimony and report his conclusions of law and fact. The master filed his report, in which he found that the complainant was entitled to an accounting from the defendant, and that the defendant was also entitled to an accounting, which shall take into consideration the services performed by him for and on behalf of the complainant with all outlays of money in connection with the various transactions handled by him and recommended that the amended cross-bill be dismissed for want of equity and that a decree be entered as prayed for in the bill of complaint. Objections to the report filed by the defendant and cross complainant were ordered to stand as exceptions. There was a hearing on the exceptions, and on January 9, 1931, the chancellor entered the decree appealed from.

By the decree the chancellor found *inter alia* that the complainant and the defendant Abraham H. Patek are sister and brother; that Sara Patek and Abraham H. Patek together with their brother Jacob Patek, during the month of February, 1920, entered into an agreement of partnership to engage in the business of buying real estate improved with old dilapidated stove-heated buildings, rehabilitating, altering or remodeling the buildings, selling and dealing therein at a profit, with a view to ultimately acquiring and accumulating a number of pieces of such improved real estate to hold for the income to be derived therefrom; that the profits and income from the enterprise were to be shared

equally between them; that Sara Patek was to invest her capital and to furnish her services in the collection of rents, act as treasurer and keep the accounts of the partnership; that Jacob Patek was to invest his capital and furnish his services as a plumber and as general mechanic in the remodeling and rehabilitating of the buildings of the defendant; Abraham H. Patek was to furnish his services as an expert real estate operator to locate and buy real estate appropriate for the partnership purposes; consummate the transactions; plan and advise the method of rehabilitation and alteration of the buildings; arrange for the refinancing of the real estate by mortgage or otherwise; find buyers for the property resold; negotiate the price and terms of purchase and of sale, and otherwise direct the general transactions of the enterprise; and it was agreed that the title to the real estate to be purchased by the partnership was to be taken in the name of Sarah Patek; one piece was to be taken in the name of Jacob Patek; that Jacob Patek died on April 21, 1921; Sarah Patek and Abraham H. Patek shortly after the death of Jacob Patek agreed to continue the partnership enterprise along the same lines with the understanding that the profits and the income were to be shared equally between them; that in pursuance of the object of the partnership, a large number of pieces of real estate were purchased over a period of about six years; a considerable amount of rehabilitation, altering and repair work was done on the various buildings, and a number of the pieces of real estate so purchased were sold, and the income from the real estate and the proceeds of the sales were from time to time invested in other like real estate; that now the complainant holds title to numerous pieces of real estate, some of which were purchased with partnership funds; that in the course of the dealing between Sara Patek and Abraham H. Patek there was an interchange of money from time to

time between them involving a great number of transactions; that moneys were disbursed from time to time by each of the parties for the benefit of the other as well as for the partnership enterprise, the number, nature and amounts of which transactions can only be ascertained by an accounting; and that said partnership was dissolved by act of the parties on December 31, 1926; and the chancellor decreed that the enterprise entered into between Sara Patek and Abraham H. Patek and Jacob Patek, and after the death of Jacob Patek continued by Sara Patek and Abraham H. Patek was a partnership; that Sara Patek and Abraham H. Patek are each entitled to one-half of the profits realized from all the dealings and transactions of said partnership, including the purchase, sale and rehabilitating of real estate, and the rents, issues and profits thereof; that the real estate owned by Sarah Patek at the date of the filing of her bill as to such part thereof, if any, as may be determined by the court to have been purchased with such partnership profits or a part thereof was declared to be impressed with an equitable lien to the extent of the partnership profits invested therein; that an accounting of all the partnership dealings and transactions be taken under the direction of the court, and the cause was referred to a master in chancery to take a full and complete account of all the business transactions had between Sara Patek and Abraham H. Patek from February 1, 1920, to ascertain and determine the original investment or investments in the partnership enterprise, each piece or parcel of property purchased, the purchase price and terms of purchase, each piece or parcel of real estate sold, the sale price and terms thereof, the rents, issues and profits of such real estate, the cost of improvements, rehabilitation and expenses of the real estate and of the partnership, the profit derived from the partnership enterprise, and the manner of rein-

vesting or disposition made of such profits, and should it be ascertained that any such partnership profit has been used to purchase investments, the description, location and nature of such investment; the amount of interest, if any, to be credited or charged on the contributions to partnership capital or advancements and the expenses of office rent, automobile or otherwise, paid or disbursed by either of the parties for the use of the partnership; and to report the said accounting with his recommendations and with his conclusions of fact and law thereon to the court.

The question for determination is whether or not the evidence shows the existence of a partnership relation between Sara Patek and Abraham H. Patek. Sara Patek denied that a partnership relation existed between her and her brother; the burden was, therefore, upon Abraham to prove its existence, by clear proof (30 Cyc. 413) and satisfactory evidence (*Walker v. Matthews,* 58 Ill. 196), and as between the parties, the question of partnership is one of intention to be proved by express agreement or inferred by the acts or conduct of the parties. (*Grinton v. Strong,* 148 Ill. 587, 596; *National Surety Co. v. Townsend Brick & Contracting Co.,* 176 Ill. 156, 161; *Reed v. Engel,* 237 Ill 628, 631, and *Goacher v. Bates,* 280 Ill. 372, 376.) A partnership can only exist in pursuance of an express or implied agreement to which the minds of the parties have assented. (*Phillips v. Phillips,* 49 Ill. 437.) There were no written articles of copartnership. To establish the partnership relation Abraham H. Patek testified in substance that in 1918 he commenced to and did live with his sister Sara until September or October of 1926. About the time he went to live with his sister he became interested in the purchase of real estate with one Richard T. Barry, with whom he had been associated in the painting business, buying old buildings, remodeling and rehabilitating them and

selling them at a profit. In the fall of 1919 he had a
conversation with Sara, in which he requested her con-
sent to place the title to the property so purchased by
himself and Barry in her name, to which she consented.
During this conversation he explained that he and
Barry were buying old buildings, which they remodeled
and sold at a profit. That in February, 1920, Sara
Patek said to Abraham that Jacob, their brother, had
suggested to her that he could do the work as well as
Barry and that it might as well be kept in the family
and that she agreed with Jacob that they ought to
make this a sort of family proposition. Shortly after,
Abraham, Sara and Jacob Patek had a conference at
which Abraham said that he had agreed to separate
from Barry and that Sara, Jacob and he would go into
the business of buying old properties, fixing them up
and selling them; that Sara would carry the title to all
properties purchased, and they discussed the question
of profits, whether Jacob would be entitled to pay for
his labor, or Sara to interest on her investments and
Abraham to any compensation for office expenses and
commissions in making any deal; that he said those
questions would only arise in case of a dissolution;
thereupon Sara stated, ''We can all depend upon treat-
ing each other fairly and honorably''; we will go
ahead, join all our funds and efforts to accumulate
property and leave the question of credits and debits
to be decided if and when we want to separate; in the
meantime we are interested equally three ways in the
profits. The conference lasted from supper until about
midnight and ended with a statement by each of the
parties that they were to join their money and efforts
in a real estate venture. He further testified that at
this conference he told Sara that a real estate operator
did not usually carry title himself; that the title would
be carried in her name; that he would get a broker's
commission and not be known as the owner. He fur-

ther testified that at one of these conferences Sara stated she had bonds valued at about $7,000 which she would sell and put into the business; that Jacob, who was a plumber and steamfitter, was to put in his money, amounting to about $2,000, and to hire the men and do most of the work. He further testified that in April of 1921, Jacob died and within a month thereafter he and Sara had a conversation in which it was said that he and Sara would have to cover the entire work, and agreed that the profit would be divided equally between them.

He further testified that after the conference at which it was agreed that they were to enter into the enterprise they purchased four pieces of property on Paulina street; two of those pieces were the property that Barry and he and Abraham had under contract before Barry and the witness separated; and that all properties that were purchased by his sister after March, 1920, were negotiated by him. Titles were taken in her name and she signed all the mortgages. He further testified that at the time he left his sister's home (sometime in September or October of 1926) he told her he was entitled to one-half of the profits under the arrangement, and that instead of owing her $6,000 an accounting would show that she owed him between $30,000 and $40,000 after giving her credit for everything he had gotten from her; that within two weeks after he left he received a telephone call from Enoch Price, her attorney; in response to the telephone call he called at the office of Price and was informed that his sister complained that he had not treated her fairly, which charge he denied, but made no such claim as related by him in his testimony before the master. After this conversation he returned to his own law office and wrote a letter; this letter addressed to Enoch J. Price was introduced in evidence by the cross defendant.

Charles C. Featherly testified that one Sunday in the spring of 1920 or 1921 he was asked to come to the Patek home regarding some work on Paulina street and there met Sara, Abraham and Jacob, and in the presence of Sara, Abraham outlined what work they wanted the witness to do on the Paulina street property, and at this meeting Jacob said, "We have formed a combination and I am going to stay on the job. Abe will take care of the business end of it and my sister Sara is quitting her dressmaking business and is going to help take care of the finances and keep house for us." Jacob also said the three of them were going to pool profits on old properties by remodeling and selling and making a profit out of them. Sara said it was three-way combination in the family.

James E. Barry testified that in 1921 or 1922 he met Sara Patek at Madison street and Western avenue and she said: "If this combination, Abe, Jake and I keep together, I won't have to bother about this school." On cross-examination he testified that Sara said there was a combination of three of them working together to get some money on old buildings, getting old buildings and fixing them up.

We have called attention to the more salient facts in the testimony upon which Abraham H. Patek relies to establish the fact that a partnership relation existed. Whether the agreement testified to by Abraham H. Patek constitutes a partnership cannot be determined by any arbitrary test. It depends upon the intention of the parties, and this intention must be gathered from the evidence as to what the terms of the agreement were and the conduct of the parties in reference to the matter. In reply to this contention of the cross complainant, Sara Patek testified that from 1911 to 1925 she was engaged in teaching dressmaking, designing and pattern making; that the first time she bought any real estate was in March, 1920; that she

learned of it through Abraham who said it could be bought very cheap; that she purchased it and that Abraham took care of the details; the property consisted of four houses on Paulina street for which she paid $11,700 in cash. She then related the purchase of other properties and that Abraham took care of the negotiations and that in all of the transactions he was her agent. She also testified directly and positively that she had no such conversations as were related by Abraham and specifically denied any such conversations ever took place, and she vigorously denied that she made the statements or admissions ascribed to her by the witnesses Featherly and Barry.

Between the stories told by the cross complainant and the cross defendant there is irreconcilable conflict. The burden was upon the cross complainant to prove a partnership existed; it was not upon the cross defendant to prove it did not exist, and so far as the proof rests upon the respective but contradictory statements, it is sufficient to say that cross complainant did not sustain the burden. It is true there are more or less supporting and corroborating circumstances shown in the evidence by both parties upon certain features of the case. By the cross complainant's own testimony it appears that no property was bought or sold without cross defendant's consent as to price or details, and that no deal was ever closed that she did not want to close; that all rents collected from any of the properties, except for the first month or two, were collected by her, and any rents collected by him were, as he claims, accounted for by him to her; that he never asked her for any division of the rents or any specific portion of the rents; that he took care of the preparation of her income tax reports, in which nothing was said about the fact that any person, other than the cross defendant, was interested in the income from the properties; she always paid the income tax and he knew that, if it was claimed that someone else had a net interest in the property, her income tax might be

reduced thereby. His own testimony goes far to defeat his claim. It appears from the record that she filed her bill in the instant case on September 19, 1928, about two years after he left her home, and it appears from the evidence that shortly after he left her home he wrote a four-page letter, addressed to her attorney, Enoch J. Price, in which he said in part:

About six years ago my sister and my brother Jake, who was then living, and myself agreed *in a general way* that we would go in the real estate business. Sister to furnish capital and brother and I to do our respective shares. *There was no understanding* as to how the proceeds were to be divided, simply a general understanding that everybody would be fair in the matter. I was to find the bargains and obtain loans and look after all the details. Proceeding along these lines we accumulated a number of pieces of property, I looking after all the details and handling of the money and drawing on my sister whenever I wanted to, rendering no account, until quite a few pieces were accumulated, when I turned the collection of rents over to my sister. We continued on without any understanding until about a little over a year ago when I got an idea how my sister figured in her own mind what the status of all the property ought to be and was. You stated to me yesterday that you thought we could come to some adjustment. You apparently are forgetting that adjustments and negotiations can be had between men but as far as a woman is concerned the thing is impossible. It is my belief that a woman is incapable of understanding equity, when her maternal instincts are aroused she will willingly go to any sacrifice and consider that she is not doing even then her full duty, but when you consider them in the light of a partnership, their idea is that what is yours belongs to them of course, but what is theirs is naturally their own.

It is important to state here that the cross complainant graduated from a law school in 1919 and is a

practicing attorney. It is fair to assume that a man versed in the law would present his claim, if any he has, in the strongest light possible. Nowhere in his conversation with Price within two weeks after he left his sister's home, nor in the letter written to Price did he claim to be a partner of his sister, his only claim being that he was entitled to payment for the very valuable services he claimed to have rendered his sister in helping her to accumulate what he termed an estate. If these statements in his letter are to be accepted as the truth, it is very clear that the minds of the parties never assented to the creation of a copartnership. (*Phillips v. Phillips,* 49 Ill. 437.)

We think from the evidence the conduct of the cross complainant was inconsistent with his present claim of partnership, and an analysis of the testimony leads us to the conclusion that a partnership was not intended by the parties. A chancellor, as well as a court of review, should be slow in disturbing the conclusions upon the facts of a master, unless it can be said that his conclusions are clearly contrary to the probative force of the evidence. (*Gruenenfelder Lumber Co. v. Golden,* 260 Ill. App. 313.)

The decree of the circuit court will be reversed and the cause remanded with directions to dismiss the cross-bill for want of equity and to enter a decree, that the complainant is entitled to an accounting from the defendant and that the defendant is also entitled to an accounting which shall take into consideration the services performed by him for and on behalf of the complainant with all outlays of money in connection with the various transactions handled by him, as recommended by the master and that said cause be referred to the master to state an account, where the cross complainant may, if he can, show to what extent the cross defendant is indebted to him.

*Reversed and remanded with directions.*

GRIDLEY, P. J., and SCANLAN, J., concur.