UNITED NUCLEAR CORPORATION, Plaintiff-Appellant, *v.* ENERGY CONVERSION DEVICES, INC., Defendant-Appellee.

First District (5th Division)   No. 81—264

Opinion filed August 20, 1982.

Francis J. Higgins, William R. Carney, George J. Casson, and Larry L. Thompson, all of Bell, Boyd & LLoyd, of Chicago (Johnson, Bromberg, Leeds & Riggs and Pennie & Edmonds, of counsel), for appellant.

Chester T. Kamin, Michael H. Salsbury, and Daniel J. King, all of Chicago (Jenner & Block and Lawrence G. Norris, of counsel), for appellee.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff United Nuclear Corporation (United) appeals from a judgment for defendant Energy Conversion Devices, Incorporated (ECD) in an action seeking damages and declaratory, injunctive, and other relief for breach of contractual and fiduciary duties involving the ownership rights to certain energy conversion technology. Plaintiff here contends that the trial court erred in a number of its rulings at points throughout the proceedings. We need consider only those issues hereinafter enumerated, since they are dispositive of this appeal or will necessarily arise in further proceedings. Those issues are whether the trial court erred (1) in its rulings as to the existence and duration of a program for the development of energy conversion technology pursuant to an agreement between United and ECD (the Agreement); (2) in its designation of a discovery cutoff date; and (3) in finding that a joint venture did not exist between the parties.

As background to the present dispute, it appears that ECD's principal business is the development of patentable inventions in the field of amorphous semiconductors. These are materials whose electrical conductivity is enhanced through certain physical and chemical modification processes. Through Stanford Ovshinsky, its president and chief executive officer, ECD has pioneered in the development of amorphous semiconductor technology. United is engaged in uranium mining and manufacturing as well as nuclear-related activities.

The present litigation arose over a dispute between United and ECD as to the parties' contractual rights and duties concerning certain amorphous semiconductor technology, believed by the parties to be a cost-effective means for the large-scale commercial conversion of sunlight into electricity (solar conversion) and of heat into electricity (thermal conversion). The type of semiconductor in question is an amorphous alloy of silicone, fluorine, and hydrogen (fluorine alloy). In essence, this new area of technology sought the development of new

semiconductors by the elimination of certain "electronic states" in the "energy gap" of amorphous semiconductor materials, and it differed fundamentally from the earlier chemical modification theory which involved the introduction of electronic states into such energy gaps.

In order to develop and exploit the potential of the new energy conversion technology, the Agreement was signed by Ovshinsky and Keith Cunningham, president of United, and was dated August 15, 1976. Relevant to our consideration here, the Agreement defined the existing and future energy conversion technology to be covered (the Technology). It further provided that ECD would sell to United an "undivided 50% interest" in the Technology and that United would pay ECD $250,000 for its undivided 50% interest "in the present Technology." United also agreed to provide ECD with an additional $250,000 for the period commencing on the date of the Agreement and ending one year after the date that the parties mutually agreed on a 1-year development program (the Initial Period). ECD and United also agreed to disclose appropriate information to each other concerning the Technology during the term of the Agreement and to keep such information confidential. The Agreement further provided that within 30 days after the expiration of the Initial Period, the parties would evaluate the Technology and the programs thereunder and assess the feasibility of a continuing business relationship. If such relationship could not be established, the Agreement would terminate, and ECD would be required "to execute and deliver all documents and instruments" to United, as required by the Agreement, in order to convey to United its interest in the Technology. Finally, upon termination of the Agreement, the parties were deemed to be the owners of an undivided 50% interest in the Technology.

In March 1977, Cunningham and Ovshinsky began discussing a continued business arrangement between United and ECD as to the Technology. It appears that in April 1977, Ovshinsky proposed the formation of a "joint venture" in which each partner would maintain a 50% interest for the purpose of developing the Technology and introducing commercial energy conversion products. The proposed arrangement contemplated proportional representation on the board of directors and the establishment of an executive committee, with ECD—in the person of Ovshinsky—maintaining day-to-day operating responsibilities during development. The proposal also envisioned that ECD would continue to supply know-how, and United would supply capital. The United board of directors, in rejecting the proposal, imposed the condition that it have voting control in any new arrangement between United and ECD.

In addition to its demand for control, United in a letter dated December 25, 1977, requested that ECD convey United's interests in "all patents, patent applications, technology and other assets" to which United was entitled under the Agreement; that ECD deliver to United "a progress report on the status of the development program contemplated by the Agreement"; that ECD deliver an accounting of funds furnished by United under the Agreement; that ECD deliver to United "a suggested schedule for the description of the content of the progress reports which ECD will deliver to [United]" in order to apprise United of developments pertaining to the business activities under the Agreement; and that ECD give "appropriate assurances" to United that it would not abandon its efforts relating to such activities.

Besides its continuing business relationship discussions with United between 1977 and May 1, 1979, ECD also carried on negotiations with other parties. As a result, in October 1977 ECD sold Japanese investors $3.4 million in subordinated convertible debentures and certain rights in the commercialization of products and processes developed by ECD in the area of energy conversion. ECD also engaged in negotiations with Atlantic Richfield Company (ARCO), and on May 1, 1979, ECD, ARCO, and an ARCO subsidiary reached an agreement (ARCO Agreement) under which ECD, in a transaction involving $3.6 million, was to conduct a program of work as outlined in the contract and grant the ARCO subsidiary a license in certain existing ECD energy conversion technology. Later, on January 14, 1980, ECD transferred further rights to ARCO for a total additional consideration of $25 million.

The instant case is predicated, *inter alia*, upon United's asserted rights under the Agreement. In this regard, the following pretrial proceedings are relevant. On May 4, 1979, United filed a complaint and moved for entry of a temporary restraining order to prevent ECD from performing any other agreements or disclosing any confidential information concerning the Technology without United's consent. The motion for a temporary restraining order was granted. Thereafter, the parties began negotiations in an effort to reach a settlement, but none was reached.

In the complaint of May 4, United alleged in substance that ECD violated the Agreement.[1] Count I alleged that under the Agreement,

---

[1]United initiated a separate action against ECD and ARCO in the circuit court of Cook County on April 1, 1980 (No. 80 CH 2232). That action was stayed pending the outcome of the present case. United also filed suit in the Delaware Court of Chancery against both ECD and ARCO. (United Nuclear Corp. v. Energy Conversion Devices, Inc. (Civil Action No. 6182).) United sought discovery from ARCO in that suit, but discovery was stayed pending the outcome of the present case.

United and ECD had entered into a joint venture for the development and exploitation of the Technology; that ECD had violated its fiduciary duties and relationship of confidence and trust in the purported joint venture; that ECD had misappropriated the Technology and its future development and had thereby impaired United's rights in it; and that ECD had converted to its own use all or a substantial portion of the funds provided by United under the Agreement. Count II alleged that ECD had wilfully breached express covenants and agreements by ECD and Ovshinsky under the Agreement; that such breaches included the failure of ECD to devote sufficient personnel, facilities and time as contemplated by the Agreement; that ECD misled United as to its activities concerning the Technology; that ECD failed to disclose to United appropriate information as to the Technology or its performance under the Agreement; that ECD refused to supply United with copies of all written Technology or to permit United representatives to examine the Technology; that ECD refused to give progress reports under the Agreement; that ECD refused to disclose to United that areas of the Technology for which future development would be warranted; that ECD refused to provide United with documentation which would establish United's undivided 50% interest in patents and patent applications covering the Technology; and that ECD disclosed confidential information about the Technology to third parties and entered into a contract with a third party relating to the Technology. Count III alleged that ECD, by Ovshinsky, breached express and implied agreements arising from the claimed joint venture and fiduciary relationship of the parties, and that ECD breached its obligations under a claimed constructive trust upon the Technology and its future development and exploitation for the benefit of United to the extent of its 50% undivided interest. Finally, count IV alleged certain statutory violations in that ECD, through Ovshinsky and Dr. Helmut Fritzsche (an officer and director of ECD), had engaged in unfair and anticompetitive practices in an attempt to gain a monopolistic advantage in the Technology and its future development and exploitation in disregard of United's 50% undivided interest and had sought to eliminate United as a competitor. (See Ill. Rev. Stat. 1979, ch. 38, par. 60—1 *et seq.*; Ill. Rev. Stat. 1979, ch. 121½, par. 261 *et seq.*) The complaint sought to enjoin ECD from disclosing information to or performing agreements with third parties relating to certain technology. It also sought an accounting, damages, and other relief.

ECD, with leave of court, counterclaimed against United, alleging in substance that United had made public assertions concerning cer-

tain ECD contracts with third parties which had harmed and threatened to cause irreparable harm to ECD's business, for which ECD sought declaratory and injunctive relief.

On May 11, 1979, in addition to its motion for a preliminary injunction, United moved for discovery on an expedited basis. In July 1979, the parties requested production of documents and noticed discovery depositions. United's requests for production sought documents, *inter alia*, related to the Agreement, the Technology and ARCO Agreement. ECD objected to the production of any technological documents "dated or created on or after August 15, 1977" allegedly because the Agreement had terminated on August 14, 1977, and because of the confidential nature of the documents.

On July 27, 1979, United moved to compel production of documents by ECD and for a protective order. The proposed order set forth various safeguards which purported to protect against disclosure of confidential information.

On April 1, 1980, United's motion for change of venue was denied on the grounds that its right to one automatic change of venue was precluded by the temporary restraining order entered on May 4, 1979, which the trial court found to be a substantial ruling in the case. (See Ill. Rev. Stat. 1979, ch. 110, par. 503.) After the case was set for trial on September 29, 1980, United withdrew its discovery motions without prejudice in order to include ECD's January 1980 Agreement with ARCO in a renewed motion to compel production of documents, and United then moved to expedite discovery due to the September 29 trial date. Trial was later reset for November 17, 1980.

On August 19, 1980, pursuant to a *subpoena duces tecum*, United gave notice of discovery and evidence depositions to nine ARCO executives. ECD and those executives moved for protective orders prohibiting any discovery from ARCO and any evidence depositions of ARCO personnel. However, the deposition of R. R. Chambers, ARCO's vice-president, was allowed to proceed. Following each session of that deposition, United moved to compel production of documents from ARCO and to compel answers to questions which Chambers refused to answer concerning the ECD-ARCO Agreements and the Technology. United had made similar motions at various times concerning other ECD employees who had refused to respond to questions on those and other subjects.

On September 29, 1980, the trial court heard arguments on all pending discovery-related motions and, thereafter, it determined that August 14, 1977, was the "cutoff discovery date" because, in the trial court's view, the Agreement "terminated" on that date. Conse-

quently, the trial court denied or dismissed as moot all of United's discovery motions, and it granted ECD's and ARCO's motions for protective orders. Concerning the discovery ruling, the trial court also found, *inter alia*, that United had the burden of making a "clear showing" that it would prevail on the merits of the contract dispute and that since it had failed to sustain such burden, it was not entitled to discovery. The trial court also found the Agreement did not create a joint venture; that such had not been demonstrated by the evidence; and that United had failed to make a "clear showing" that the Agreement continued beyond August 14, 1977.[2]

On October 29, 1980, United again moved for a change of venue alleging trial court prejudice. That motion was denied, and on November 17, 1980, trial commenced.

At trial, the following relevant facts were not seriously disputed. As of August 15, 1976, ECD was doing energy conversion work, and on September 22, 1976, Ovshinsky sent Cunningham a report entitled "Confidential, ECD's Energy Conversion Program with United Nuclear." That report, which was prepared by ECD employee Richard Flasck, outlined the progress ECD had made, described ECD's plans for the following three months under the Agreement, and expressed the importance of the goals ECD had sought. ECD's first billing for $26,490.16 for work performed from August 15, 1976, to September 15, 1976, accompanied the report and was paid by United on October 12, 1976, with Cunningham's approval. In a letter accompanying the payment to ECD, Cunningham expressed his interest in reviewing "the general level of activity" with Ovshinsky and said that the payment was "for the first month's billing on our mutual project."

As to the report, Cunningham testified at trial that as a proposed plan for the Initial Period, it was inadequate and "required additional particularity in order to be satisfactory under the [A]greement" and that Ovshinsky told him "he would attempt to further develop the matter and provide [Cunningham] with a further program."

Ovshinsky testified, on the other hand, that by mid-October 1976, several ECD employees were engaged in developing "a general program approach" to the United-ECD project; that he could recall no meetings or telephone conversations with Cunningham or anyone else at United between August 15, 1976, and mid-October 1976, nor could

---

[2]On October 14, 1980, United filed an original action for a writ of *mandamus* with the Illinois Supreme Court, seeking to compel the requested discovery and a change of venue. (See 73 Ill. 2d R. 381.) On November 11, 1980, leave to file the *mandamus* action was denied without opinion. United Nuclear Corp. v. The Honorable Joseph M. Wosik (No. 54122).

he recall any specific acceptance by Cunningham of the September 22 report, but he said he believed Cunningham had accepted it based on conversations that took place between them after September 22; and that no document concerning a development program had been signed by ECD and United.

The record further indicates that certain scientific achievements were made under the Agreement. In November 1976, Cunningham and Dr. David Bromley, a United director, visited ECD's laboratories and received a report on significant experimental and scientific results of ECD's work to date. Specifically, ECD reported at the meeting that it was developing a technology for production of a type of semiconductor called amorphous chalcogenides, which could be made suitable for efficient and economical use in solar cells, as compared to established but more expensive crystalline solar cell materials. Prior to ECD's efforts, no amorphous chalcogenide semiconductors had been produced which could be controlled at room temperature, but as ECD explained, through a technology involving a chemical modification process using a fluorine alloy, the conductivity of amorphous chalcogenides could be controlled at room temperature.

Concerning the November 1976 meeting, Bromley testified that technical details concerning ECD's work were not disclosed at the meeting. Four charts also were shown to Bromley at trial, which he admitted seeing at the meeting.

From November 1976 through January 1977, ECD worked to confirm the results reported at the November meeting. It also applied for at least five patents—all of which were granted. Two related to silicon-based materials, and three pertained to a fluorine alloy. The first two patent applications also confirmed United's undivided 50% interest therein pursuant to the Agreement.

It is also undisputed that ECD conceived of and developed the fluorine alloy in question, and United's position that ECD had impaired its rights in the Technology focused chiefly upon the fluorine alloy. In support thereof, United called four witnesses to testify whether, in their opinion, the fluorine alloy and its use in reducing or eliminating the "energy gap" in amorphous semiconductor materials was conceived by ECD prior to August 15, 1977. The testimony of those experts was based upon the discovery permitted by the trial court as to ECD's confidential scientific documents and records relating to the Technology.

First, Dr. Gregory Stillman, a professor of electrical engineering and a specialist in crystalline semiconductor physics and semiconductor devices, testified that in his opinion ECD was "doing a significant

amount of work on amorphous semiconductors" and had performed at least one experiment with silicon, hydrogen, and fluorine before August 15, 1977, and actually produced the alloy before that date. Second, Dr. Leo Kadanoff, a professor of physics and a specialist in the area of condensed matter and solid state physics, gave his opinion that the combination of fluorine with silicon and hydrogen was conceived by ECD prior to August 15, 1977. He was not certain, however, that ECD had conceived or developed a fluorine alloy or that Ovshinsky or other ECD personnel had "a clear mental image" of the use of such alloy as of that date. He also testified that he had reviewed ECD's laboratory books and memoranda and had found no evidence that fluorine had been used in an experiment or that a fluorine alloy had been produced prior to August 15, 1977. Third, Dr. John Hopfield gave his opinion that the concept of combining fluorine and hydrogen with silicon to prepare an amorphous film was conceived by ECD prior to August 15, 1977. He also testified that he had found no evidence that the concept of the alloy had been committed to paper or communicated to anyone or that the alloy had been produced by ECD before August 15, 1977. Finally, Dr. Nicholas Holonyak, Jr., a professor of electrical engineering and a specialist in crystalline semiconductors and semiconductor devices, testified that in his opinion the combination of fluorine and hydrogen with silicon to make an amorphous semiconductor material was conceived by ECD prior to August 15, 1977. He found no evidence, however, that a fluorine alloy had been committed to paper or communicated to anyone or that the alloy had actually been produced prior to August 15, 1977. Also, in this regard, Cunningham testified that at a meeting in March 1977, Ovshinsky for the first time discussed the use of fluorine in connection with "amorphous silicon." On cross-examination, Cunningham stated that he was uncertain as to the details of that conversation.

In contrast to the testimony of United's witnesses, three ECD experts testified that the concepts of the fluorine alloy and of using it to reduce or eliminate energy gaps in amorphous semiconductor materials were not conceived by ECD before August 15, 1977. It was undisputed that these witnesses were experts in the fields of amorphous semiconductor materials and devices and in solar cells. First, Ovshinsky testified that ECD did no work with alloys of amorphous silicon, fluorine, and hydrogen before August 15, 1977, and that the invention of such alloys was not conceived by ECD prior to that date. Second, Dr. David Adler, a professor of electrical engineering with expertise in the field of amorphous semiconductors and an ECD consultant, testified that based upon his personal knowledge and experience

with ECD's work prior to August 15, 1977, and his close personal contact with Ovshinsky, it was his opinion that the invention of the fluorine alloy was not conceived by anyone at ECD before August 15, 1977. Finally, Dr. Helmut Fritzsche, a physicist and vice president of research and a director of ECD, testified that he was intimately involved in ECD's work and was in close personal contact with Ovshinsky between August 15, 1976 and August 15, 1977. He also testified that he knew when ECD began working with alloys of silicon, fluorine, and hydrogen and that such work was not begun before August 15, 1977.

In its judgment order, the trial court found, *inter alia*, that the Agreement was complete and unambiguous, so that extrinsic evidence pertaining thereto was excluded; that the Agreement terminated on August 14, 1977, as a consequence of which United was not entitled to any interest in technology—including the fluorine alloy—conceived, developed, or otherwise acquired by ECD on or after August 15, 1977; that as of August 15, 1977, United and ECD each were free to use, sell, or otherwise dispose of their respective 50% interests in the Technology without restriction, so that as of that date ECD had the right to enter into agreements with parties other than United as to the Technology and was free to divulge confidential information about it to third parties; that United and ECD had not formed a joint venture; that there was no fiduciary relationship between United and ECD or Ovshinsky; that the Technology and its future development was not impressed with a constructive trust for the benefit of United to the extent of its 50% undivided interest; and that United failed to sustain its burden of proof as to the material allegations of its complaint. The court entered judgment in favor of ECD and against United on all counts of the complaint. From that final judgment, United brings the present appeal.

OPINION

Initially, we consider United's contention that the trial court erred in foreclosing discovery after August 14, 1977. We find merit in that contention since our review of the record leads us to conclude that the trial court's ruling improperly denied discovery to United on its theory of the case. It is significant in this regard that the trial court viewed the Agreement as terminating on August 14, 1977, inasmuch as that finding was indispensable to its ruling as to the discovery cut-off date. To fully explain the relationship between the trial court's misapprehension of the instant contract and the related discovery ruling and to assess the impact of that ruling on the trial, it is first nec-

essary to focus upon the relevant provisions of the Agreement.

Paragraph 1 of the Agreement defined the Technology as follows:

"As used in this Agreement the term 'Technology' shall mean, all (i) information, knowledge, techniques, drawings, blueprints, specifications, processing data, formulae and inventions, heretofore developed or otherwise acquired by ECD, which conceptually or practically involve the conversion of any form of energy (including, for example, light, heat, moisture or chemical energy), to electrical energy through or as a result of a photoelectric effect or other method of generating or storing electrical energy for use as electrical potential, and (ii) future modifications and improvements hereafter conceived or developed, or otherwise acquired by ECD during the term of this Agreement, and (iii) prototypes, models, and products resulting from the application of the Technology."

United's purchase of an undivided 50% interest in the Technology was set forth in paragraph 3, which provided in relevant part:

"ECD hereby sells and assigns to United and United hereby purchases from ECD an undivided 50% interest in all of ECD's right, title and interest in and to the Technology and all rights, benefits and advantages appertaining thereto, including all future developments, modifications and improvements in the Technology. ECD agrees to execute such assignments, instruments and other documents of title, from time to time during the term of this Agreement as may be necessary, in the reasonable judgment of United, to convey to United, United's undivided interest in the Technology, including, without limitation, all documentation, required to establish and confirm the undivided one-half interest of United in all patents and patent applications relating to the Technology."

Consideration was governed by paragraph 4, which provided in relevant part:

"(a) In consideration of the sale by ECD to United of the 50% undivided interest in the present Technology, United agrees to pay ECD the sum of $250,000. ECD acknowledges that it has previously received $75,000 of such amount, and further acknowledges that it has received the balance of $175,000 simultaneously with the execution of this Agreement. Such $250,000 shall be deemed to be a non-refundable payment for that portion of the Technology being acquired by United on the date hereof.

(b) In consideration of the sale by ECD to United of the undi-

vided interest in all future developments, modifications and improvements in the Technology and in consideration of the covenants and agreements of ECD herein contained, United agrees to provide funds to ECD of $250,000 to develop and exploit the Technology during the period commencing on the date hereof and ending one year after the date of mutual agreement between ECD and United on a one-year development program (the 'Initial Period'). Such funds shall be furnished to ECD by United at such times during the Initial Period as may be appropriate, in the judgment of United and ECD, to permit ECD to perform the duties contemplated by the Periodic Reports ***."

Finally, future business arrangements between the parties and termination of the Agreement were governed by paragraph 11:

"Within thirty (30) days after the expiration of the Initial Period, ECD and United shall mutually evaluate the status of the Technology and the programs which have been undertaken pursuant to this Agreement and the feasibility of continuing a business arrangement with respect thereto. In the event ECD and United shall be unable to reach a mutually agreeable business arrangement within such thirty (30) day period which contemplates the continuance of a business arrangement, this Agreement and all obligations of ECD and United hereunder shall terminate without further liability of either party thereto, except that ECD shall be required to execute and deliver all documents and instruments required by Paragraph 3 above to convey to United its 50% interest in the Technology. Upon such termination, or upon termination by United pursuant to Paragraph 5 or 7 above, United and ECD shall each be deemed to be the owner of an undivided 50% interest in and to all Technology."

In the order of October 3, 1980, disposing of the parties' discovery motions, the trial court found, *inter alia*, that the "Initial Period" of the Agreement commenced on August 15, 1976, and ended "one year after the date of mutual agreement between [United] and ECD on the development program." The trial court concluded in the order, *inter alia*, that a party seeking discovery of confidential scientific or technical information, as here, must demonstrate the need for such information by a "clear showing" and that United failed to make such a showing as to the post-August 15, 1977 information. In this regard, the trial court stated in the order that:

"[T]he Agreement by its terms ends one year after the date of commencement of the one-year development program; [United]

has no interest in technological work developed by ECD after termination of the Agreement; and, as to the Technology conveyed under the Agreement [United], as owner of a 50% undivided interest, may not require its co-owner ECD to obtain [United's] consent before, or account to [United] after, conveying the Technology to third parties if the conveyance occurred after the termination of the Agreement. *** [United] has failed to make the necessary showing that discovery of ECD's post-August confidential scientific work could lead to the discovery of admissible evidence."

The trial court also found that United failed to make a "clear showing" that the term of the Agreement extended beyond August 14, 1977. Thus, in the trial court's view, it was proper to limit discovery to matters prior to August 15, 1977.

In the judgment order of January 27, 1981, the trial court reiterated and expanded upon its interpretation of the Agreement as set forth in the order of October 3, 1980. In the judgment order, the trial court found that for a payment of $250,000 United purchased an undivided 50% interest in the Technology "conceived, developed, or otherwise acquired" by ECD before August 15, 1976, and for another payment of $250,000 ECD agreed to perform a 1-year development program to further develop and exploit the Technology. Further, United purchased an undivided 50% interest "in all improvements, modifications, and developments in the Technology conceived, developed, or otherwise acquired by ECD during the term of the Agreement." The trial court also found that the Agreement would terminate at the end of the "development program" unless the parties mutually agreed upon a further written business arrangement within 30 days after the conclusion of the purported development program. Upon termination of the Agreement, United was to retain its undivided 50% interest in the Technology but had no right in any further work of ECD. In addition, in view of paragraphs 1 and 11, the trial court construed paragraphs 3 and 4(b) as meaning that besides United's undivided 50% interest in the Technology acquired by ECD as of August 15, 1976, United received a similar undivided 50% interest in all future developments in the Technology during the term of the Agreement. The trial court found that the Agreement terminated on August 14, 1977, so that United was not entitled to any interest in technology conceived, developed, or otherwise acquired by ECD "on or after August 15, 1977."

█ We believe the trial court was incorrect in construing the Agreement as ending by its terms on August 14, 1977. Under para-

graph 1 of the Agreement, the term "Technology" is defined on three levels. First, it refers to "information, knowledge" and other specified categories developed or otherwise acquired by ECD as of the date of the Agreement (August 15, 1976). In turn, the specified categories "conceptually or practically involve the conversion of any form of energy" to electrical energy. Any such form of energy may be so converted "through or as a result of a photoelectric effect or other method of generating or storing electrical energy for use as electrical potential." Second, the Technology is defined as "future modifications and improvements hereafter conceived or developed, or otherwise acquired by ECD during the term of this Agreement." Finally, Technology is defined as "prototypes, models and products resulting from the application of the Technology." Of the three definitions, we are here principally concerned with the second, insofar as the effect of the phrase "during the term of this Agreement."

In this regard, it is with paragraph 4(b) of the Agreement that we depart from the interpretation given by the trial court. Paragraph 4(b) provides that United agreed to pay $250,000 to ECD as consideration for the sale of "all future developments, modifications and improvements in the Technology" and as consideration for ECD's covenants and agreements under the contract. This second payment of $250,000 was for the purpose of developing and exploiting the Technology "during the period commencing on the date hereof and ending one year after the date of mutual agreement between ECD and United on a one-year development program." The Agreement terms such length of time the "Initial Period." It is our belief that such period commenced on August 15, 1976—the date of the Agreement—but the Agreement is silent as to the beginning of the "mutual agreement between ECD and United on a one-year development program." The trial court, however, apparently believed such date to have been August 15, 1976; but, in our view, the beginning of the Initial Period and the beginning of the mutual agreement on the development period were not contemporaneous, and thus the termination date is not specified in or ascertainable from the Agreement. Indeed, had there been an agreed date for the commencement of a 1-year development program, it seems likely that the parties would simply have provided for the termination of such a program one year later—on August 15, 1977.

The trial court's reading of the Agreement is also incorrect in light of the 30-day grace period for establishing a future business arrangement under paragraph 11. Thus, even if the 1-year development program had commenced on August 15, 1976, and ended on August

14, 1977, the Agreement could not have terminated under any theory until at least 30 days thereafter. Consequently, the period of time encompassed by the phrase "during the term of this Agreement" cannot be gleaned from the Agreement itself.

It follows from the trial court's incorrect reading of the Agreement that its discovery order of October 3, 1980, resting as it did upon the Agreement, was improper.

■ Section 58(1) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 58(1)) provides that discovery shall be governed by rules. Accordingly, Supreme Court Rules 201-219 (73 Ill. 2d Rules 201-219) were adopted to implement section 58(1). In particular, Rule 201, which sets forth general discovery provisions, provides in relevant part:

> "(b) Scope of Discovery.
>
> (1) *Full Disclosure Required.* Except as provided in these rules, a party may obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking disclosure or of any other party, including the existence, description, nature, custody, condition, and location of any documents or tangible things, and the identity and location of persons having knowledge of relevant facts. The word 'documents,' as used in these rules, includes, but is not limited to, papers, photographs, films, recordings, memoranda, books, records, accounts, and communications.
>    \*\*\*
>
> (c) Prevention of Abuse.
>
> (1) *Protective Orders.* The court may at any time on its own initiative, or on motion of any party or witness, make a protective order as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression.
>
> (2) *Supervision of Discovery.* Upon the motion of any party or witness, on notice to all parties, or on its own initiative without notice, the court may supervise all or any part of any discovery procedure.
>    \*\*\*
>
> (j) Effect of Discovery Disclosure. Disclosure of any matter obtained by discovery is not conclusive, but may be contradicted by other evidence."

Thus, we think it clear that under Rule 201(b)(1), information is relevant and discoverable if it is germane to a "claim or defense" in a

case; that is, where issue is joined by the pleadings. In view of the record before us, we are of the opinion that the discovery order was not consistent with the underlying purposes of Rule 201.

In accordance with Rule 201, it has been stated that the ascertainment of truth and the ultimate disposition of the lawsuit are better accomplished when the parties are well educated through discovery as to their respective claims in advance of trial. (*Biehler v. White Metal Rolling & Stamping Corp.* (1975), 30 Ill. App. 3d 435, 333 N.E.2d 716; *Drehle v. Fleming* (1970), 129 Ill. App. 2d 166, 263 N.E.2d 348, *aff'd* (1971), 49 Ill. 2d 293, 274 N.E.2d 53.) The discovery rules are designed to provide the means to discover relevant matter by motion or on written request and from third parties through use of subpoena. (*Redmond v. Central Community Hospital* (1978), 65 Ill. App. 3d 669, 382 N.E.2d 95.) The purpose of discovery is also to enable counsel to prepare better and evaluate their cases (*Biehler v. White Metal Rolling & Stamping Corp.* (1975), 30 Ill. App. 3d 435, 333 N.E.2d 716) and to eliminate surprise at trial, but it should not be used as a tactic to obstruct the trial process (*People v. Benhoff* (1977), 51 Ill. App. 3d 651, 366 N.E.2d 359). The discovery rules also are intended to fix guidelines for a fair and orderly procedure by which discovery may be accomplished. *Bruske v. Arnold* (1968), 100 Ill. App. 2d 428, 241 N.E.2d 191, *aff'd* (1969), 44 Ill. 2d 132, 254 N.E.2d 453, *cert. denied* (1970), 398 U.S. 905, 26 L. Ed. 2d 65, 90 S. Ct. 1697.

As to the scope of discovery in general, the right of discovery is limited to disclosure regarding matters relevant to the subject matter involved in the pending action, and a trial court does not abuse its discretion in denying discovery of a subject not relevant to the action. (*Harris Trust & Savings Bank v. Joanna-Western Mills Co.* (1977), 53 Ill. App. 3d 542, 368 N.E.2d 629.) However, great latitude is allowed in the scope of discovery, and discovery thus includes not only what is admissible at trial, but also that which leads to what is admissible. *Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 221 N.E.2d 410; *Krupp v. Chicago Transit Authority* (1956), 8 Ill. 2d 37, 132 N.E.2d 532; *Elliot v. Board of Education* (1975), 31 Ill. App. 3d 355, 335 N.E.2d 33; also see *People ex rel. Terry v. Fisher* (1957), 12 Ill. 2d 231, 145 N.E.2d 588.

■ Concerning the powers of the court with respect to discovery, it has been held that in such matters, including notices to produce, the power vested in the trial court requires the careful exercise of discretion in order to balance the necessity of truth seeking against needless harassment of a party litigant. (*Cedric Spring & Associates, Inc. v. N.E.I. Corp.* (1980), 81 Ill. App. 3d 1031, 402 N.E.2d 352;

*Cohn v. Board of Education* (1970), 118 Ill. App. 2d 453, 254 N.E.2d 803.) The trial court also has broad discretionary power to ensure fair and orderly trials, and it can restrict pretrial discovery where probative value is lacking. (*People ex rel. Illinois State Dental Society v. Norris* (1979), 79 Ill. App. 3d 890, 398 N.E.2d 1163.) A reviewing court will not disturb a trial court's ruling on discovery matters absent a manifest abuse of discretion. (*Dobbs v. Safeway Insurance Co.* (1978), 66 Ill. App. 3d 400, 384 N.E.2d 34.) Accordingly, we think the teaching of the cases is that a trial court's order barring discovery will be found to be an abuse of discretion if such ruling prevents the ascertainment of truth or substantially affects a crucial issue in the case, and if a trial court, as here, restricts the scope of discovery on the basis of its erroneous interpretation of a contract, such restriction obstructs the ascertainment of truth and is, consequently, an abuse of discretion.

In the present case, the effect of the trial court's discovery order of October 3, 1980, was to preclude United from the discovery of evidence relevant to its theory of the case. In particular, United was not afforded adequate opportunity to show that it had certain rights to the fluorine alloy as defined Technology and its future developments under the Agreement, since United was effectively denied access to information concerning whether the alloy was conceived after August 15, 1977. We note, in this regard, United's contention that the fluorine alloy was conceived within the period ending 30 days following the expiration of the 1-year mutually agreed upon development program; or, in the alternative, that the alloy was the subject of "future developments, modifications and improvements of the Technology" conceived prior to or during the term of the Agreement. Thus, the trial court's ruling appears to have foreclosed full consideration of those factual issues, since it assumes what length of time was covered not only by the Agreement but also by the development program and by denying discovery as to the alloy based on those assumptions. *Cf. General Magnetic Corp. v. Erickson* (1966), 75 Ill. App. 2d 472, 220 N.E.2d 633 (reversal of trial court on grounds that trial on merits effectively occurred where, in action to restrain former employee from disclosing alleged trade secret to new employer, trial court held "in camera" hearing on defendant's motion to dissolve injunction and plaintiff's motion for production of documents and thereafter dismissed action).

Allowing discovery beyond the August 15, 1977, date might have affected the outcome of the trial in other respects. United further contends, as part of its theory of the case, that it is entitled to discov-

ery of the post-August 15, 1977, confidential scientific work of ECD and ARCO because such discovery is relevant to or could lead to the disclosure of admissible evidence relevant to the allegations of its complaint. Specifically, United maintains that such discovery could show that the technology conveyed by ECD to ARCO is the same technology or is based upon the same technology as was developed under the Agreement prior to August 15, 1977. Discovery also could show that ECD intentionally withheld documentation as to the details of its scientific work made during the purported Initial Period while negotiating with third parties, and it could show that ECD violated the confidentiality provisions of the Agreement and that the Technology developed during the purported Initial Period had uses and commercial value that would assist United in evaluating its damages.

In *Cox v. Yellow Cab Co.* (1975), 61 Ill. 2d 416, 337 N.E.2d 15, the court found that plaintiff's counsel, during cross-examination of a corporate defendant's employee, might have been able to make effective use of statements made by the employee on a form which was required for reporting motor vehicle accidents and was not shown to be privileged. The reason, in the court's view, was that the employee had failed to provide a description of the accident as required by the form, and the form might have proved helpful in attacking the employee's credibility, which was crucial to defendant's case. Thus, the court held that the failure to require production of the form, which was otherwise discoverable, was prejudicial error necessitating a new trial.

In addition, we think it significant that the Agreement conveyed to United an undivided 50% interest in the Technology and "in all future developments, modifications and improvements" therein. United alleged that ECD had "harboured" the Technology and its future development and had sold it to ARCO without United's consent, thereby excluding United from the potential technology contemplated under the Agreement. In light of the necessity for a new trial, we need not determine the effect of the phrase "all future developments, modifications and improvements in the Technology," but we think it clear that United was entitled to discovery of all relevant information concerning the above allegations, irrespective of whether such information came into existence before or after August 15, 1977.

In this regard, *Bee Chemical Co. v. Service Coatings, Inc.* (1969), 116 Ill. App. 2d 217, 253 N.E.2d 512, is instructive. That case involved an action alleging wrongful use of a trade secret by former employees and their corporate employer. The court held that a discovery order was proper which directed defendants to produce all formulae for products manufactured or sold by the defendant corporation of

the type involved in the litigation. The court reasoned that disclosure of the formulae was the only method of ascertaining the truth, and it noted that the order—which also directed plaintiff to produce formulae—provided adequate safeguards as to the use of such formulae and the persons to whom it would be revealed. (*Cf. Day v. Illinois Power Co.* (1964), 50 Ill. App. 2d 52, 199 N.E.2d 802 (photos and written reports by agents of defendant power company relating to gas main explosion were not privileged from disclosure as work product of attorney since defendant had exclusive control over circumstances surrounding event and exclusive and superior opportunity to know or ascertain facts).) Thus, in the present case, ECD's claim of confidentiality as to the post-August 14, 1977, developments in the Technology provides no basis for denying the requested discovery. A party's interest in confidentiality is properly addressed by a protective order. In this regard, it has been held that a protective order which dictates guidelines for control of the requested party's evidence, sought for inspection or testing by the requesting party, is not likely to violate the spirit of full disclosure which underlies the discovery rules but is likely to further the principle that litigation is best served when each party knows as much about the controversy as is reasonably practicable. (*Klick v. R. D. Werner Co.* (1976), 38 Ill. App. 3d 575, 348 N.E.2d 314.) Thus, ECD's assertions that certain discoveries relative to the Technology and sought by United are unique, that United's allegations of relevancy are unsubstantiated, and that disclosure would diminish the value of those discoveries are unavailing. (Also see *Melori Shoe Corp. v. Pierce & Stevens, Inc.* (D. Mass. 1953), 14 F.R.D. 346.) We note, in this regard, that any protective order must conform to the principles and purposes of discovery as discussed hereinabove.

Thus, bearing in mind the particular facts and circumstances of this case (see *Sarver v. Barrett Ace Hardware, Inc.* (1976), 63 Ill. 2d 454, 349 N.E.2d 28), the court should, when necessary, fashion guidelines for control of evidence, setting forth what tests or inspection may be conducted; when, where and by whom; who may be present, including representatives of all parties to the cause; how far tests or inspections can go; and what authority each of the parties shall have in that regard, and such type of production order should be neither burdensome nor prejudicial to the requesting party. (See *Servbest Foods, Inc. v. Emessee Industries, Inc.* (1980), 82 Ill. App. 3d 662, 403 N.E.2d 1; *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 380 N.E.2d 1106; *Klick v. R. D. Werner Co.* (1976), 38 Ill. App. 3d 575, 348 N.E.2d 314.) In light of these cases, it was improper for the trial court to require United to make a "clear

showing" in its discovery request.

The trial court's discovery order also prematurely disposed of the key factual issues as to when, if ever, the Agreement "terminated" and what length of time, if any, was encompassed by the Initial Period. Those controverted questions of fact should not have been decided without benefit of trial in the absence of a motion for partial summary judgment. Instead, the questions of the Agreement's termination date and of the existence and duration of the Initial Period should not have been resolved until the parties had the opportunity to present all evidence based on full discovery. United also should have been permitted to examine all relevant documents concerning "improvement" in the Technology. In this regard, it is significant that Dr. David Adler testified that he had a discussion with Ovshinsky sometime between August 15, 1977, and the end of December 1977 concerning the use of fluorine in combination with silicon and hydrogen. Discovery of relevant documents might have determined whether that discussion pertained to any improvement in the Technology. Finally, documents which came into existence after August 15, 1977, could have related back to the pre-August 15, 1977, period and contained information as to when the alloy was conceived.

Furthermore, had discovery been allowed as to documents beyond August 15, 1977, the evidence adduced at trial might have assumed a different character. We note, for example, that the trial court found Cunningham not to be a credible witness as to his testimony that the 1-year development program had not been agreed upon. If, however, post-August 15, 1977, discovery revealed that no such program had been agreed upon, Cunningham's testimony, as well as the affidavit and deposition taken of him before trial, would be somewhat corroborated. Similarly, the trial court found incredible the testimony of Dr. David Bromley as to ECD's failure to disclose technical details to him at the November 1976 meeting. However, discovery beyond August 15, 1977, might reveal that such technical information was available to ECD in 1976 but not disclosed to United, as it alleged. Likewise, the testimony of United's experts concerning the date the fluorine alloy was conceived might necessarily be accorded more weight in light of post-August 14, 1977, discovery. Thus, the effect of the trial court's discovery ruling was to handicap United in its efforts to refute ECD's claim that the fluorine alloy was conceived after August 14, 1977.

Expanding discovery beyond August 14, 1977, also would permit the taking of evidence depositions from ARCO executives and might assist United in proving certain of its allegations, in particular that ECD disclosed confidential information about the Technology to third

parties and breached its fiduciary duties and relationship of confidence and trust. Post-August 14, 1977, documents and statements also could contain important admissions by ECD personnel, and such discovery could disclose the use and commercial value of the developments in the Technology made prior to August 15, 1977, under the Agreement. By the same reasoning, we conclude that the portions of the orders effectively barring discovery and evidence depositions of ARCO executives, based as they were on the August 14, 1977, cutoff date, also were improper. One of the chief allegations of United's complaint was, in essence, that the conduct of ECD and ARCO violated the terms of the Agreement, and ECD's counterclaim sought a declaratory judgment with respect to all ARCO contracts. The allegations of the complaint and counterclaim thereby placed the ARCO contracts directly at issue.

■ In summary, as a result of the discovery order of October 3, 1980, the trial court precluded discovery of evidence relevant to United's claim and refused at trial to consider such evidence. We hold, therefor, that the trial court committed prejudicial and reversible error by denying discovery of post-August 14, 1977, technological documents and statements which might have supported United's case.

■ We are also of the belief that the trial court erred in finding as a matter of law that the agreement did not establish a joint venture.[3] Whether a joint venture exists is a question of the intent of the parties (*Maimon v. Telman* (1968), 40 Ill. 2d 535, 240 N.E.2d 652; *Russell v. Klein* (1975), 33 Ill. App. 3d 1005, 339 N.E.2d 510), and we believe here that the language of the Agreement was such that a factual inquiry was required to ascertain whether the parties intended to form a joint venture. In general, the following elements are determinative of such intent: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) joint interest as shown by the contribution of property, financial resources, effort, skill, or knowledge by each joint venturer; (4) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) provision for the joint sharing of profits and losses. (*Richton v. Farina* (1973), 14 Ill. App. 3d 697, 303 N.E.2d 218; also see *Flammia v. Mite Corp.* (E.D. N.Y. 1975), 401 F. Supp. 1121, *aff'd* (2d Cir. 1977), 553 F.2d 93 (apply-

---

[3]Paragraph 14 provides that the Agreement is to be governed by New York law. While choice-of-law provisions are recognized and enforced in Illinois (*Hofeld v. Nationwide Life Insurance Co.* (1975), 59 Ill. 2d 522, 322 N.E.2d 454), Illinois law would not produce a different result on the question of the joint venture.

ing New York law).) A joint venture agreement need not expressly state that such was intended (see *Ditis v. Ahlvin Construction Co.* (1951), 408 Ill. 416, 97 N.E.2d 244; *Baker Farmers Co. v. ASF Corp.* (1975), 28 Ill. App. 3d 393, 328 N.E.2d 369), but if any of those elements is not present, a joint venture will not be established (see *Prassas v. Nicholas W. Prassas & Co.* (1981), 94 Ill. App. 3d 311, 418 N.E.2d 904).

■ In the present case, it appears first of all that the purpose of the parties in entering into the Agreement was to make a profit. The Agreement contemplated an initial 1-year development program and the eventual commercialization of energy conversion products. Both parties also were entitled to an undivided 50% interest in defined Technology. The granting of such interest to United further reflects a manifestation of intent by the parties to be associated as joint venturers. Third, the Agreement provided for joint interest as was shown by United's contribution of capital—in the form of two payments to ECD of $250,000 each—and by ECD's contribution of effort, skill, and knowledge in the development of the Technology. Fourth, the Agreement appears to provide for some degree of joint proprietorship or mutual right to control. Such was evidenced by the requirement that ECD perform the 1-year development program and make periodic reports of its progress to United. If United objected to ECD's work, it had the right to terminate the Agreement. Those factors suggest that United had the right to exercise some degree of control. (See *Prassas v. Nicholas W. Prassas Co.* (1981), 94 Ill. App. 3d 311, 418 N.E.2d 904; also see *Wagner v. Derecktor* (1954), 306 N.Y. 386, 118 N.E.2d 570.) Finally, we note that under the Agreement, United was to fund a research project and agreed to accept, as its return, an interest in the resulting technological products, as did ECD for its contribution of labor, skill, and knowledge. Conversely, both parties agreed to accept liability in kind if their project failed. In short, United agreed to accept the loss of its financial investment, and ECD agreed to accept the loss of the time and effort it expended. In our view, this was indicative of a sharing of profits and losses. (See *Richton v. Farina* (1973), 14 Ill. App. 3d 697, 303 N.E.2d 218; also see *Steinbeck v. Gerosa* (1958), 4 N.Y. 2d 302, 151 N.E.2d 170, 175 N.Y.S.2d 1, *appeal dismissed* (1958), 358 U.S. 39, 3 L. Ed. 2d 45, 79 S. Ct. 64.) We conclude, therefore, that the trial court erroneously excluded evidence as to whether the parties intended to create a joint venture.

In seeking reversal, United calls attention to various other instances of purported error committed at trial and not previously mentioned herein. United asserts that the trial court denied it the right to

present evidence in support of its theory of the case; that the trial court misapplied the parol evidence rule; that evidence of the ECD patents, the Japanese contract, and the ARCO contracts was improperly excluded; that the trial court improperly ruled ECD had not waived the attorney-client privilege as to the opinions of its patent counsel; that in excluding evidence purportedly contradictory to ECD's theory of the case, the trial court misapplied the evidentiary rules as to party admissions; that the trial court denied United the right to cross-examine Ovshinsky by *sua sponte* removing him from the witness stand during direct examination; that the trial court improperly barred United's expert witness from testifying about the relationship between ECD's patents and patent applications and the Technology in which United had a 50% undivided interest; and that the judgment of the trial court was against the manifest weight of the evidence and was predicated upon an incorrect view of patent law.

■ We find it unnecessary to consider any of the above-enumerated contentions of United, inasmuch as those issues are urged as grounds for reversal, and our decision concerning the trial court's discovery ruling of October 3, 1980, compels reversal and remand of the instant case. Where a judgment is reversed on one ground, other grounds assigned for reversal will not be passed on. (*Maybell v. Mayor's License Com.* (1981), 95 Ill. App. 3d 653, 420 N.E.2d 571; *Kaplan v. Keith* (1978), 60 Ill. App. 3d 804, 377 N.E.2d 279.) Furthermore, the results of discovery in future proceedings may affect the character and content of a new trial, so that even if the same alleged errors occur upon retrial, they may or may not be prejudicial. Thus, it is uncertain whether our pronouncements on the additional questions raised by United will not be speculative and have no effect on future proceedings in this case. A reviewing court is not obligated to decide moot or abstract questions, review a case merely to establish precedent, or render judgment to guide potential future litigation. (*In re Nolan* (1981), 94 Ill. App. 3d 1081, 419 N.E.2d 550; *Betts v. Village of Calumet Park* (1961), 32 Ill. App. 2d 67, 176 N.E.2d 632.) Also, as fully explained below, a change of venue may be requested upon remand.

■ As the foregoing discussion indicates, it is unnecessary for us to determine if the trial court erred in denying United's motions for change of venue. We note, however, that the Venue Act provides for one automatic change of venue prior to any substantive ruling in the case if statutory requirements are satisfied (Ill. Rev. Stat. 1979, ch. 110, par. 503; *In re Estate of Roselli* (1979), 70 Ill. App. 3d 116, 388 N.E.2d 87) and, thereafter, if the petition for change of venue con-

tains specific allegations of prejudice on the part of the trial court (*M. Loeb Corp. v. Brychek* (1981), 98 Ill. App. 3d 1122, 424 N.E.2d 1193; *American State Bank v. County of Woodford* (1977), 55 Ill. App. 3d 123, 371 N.E.2d 232). Here, the trial court found that it had made a substantive ruling in granting United's motion for a temporary restraining order. Apparently, the trial court also concluded that United failed to show prejudice in connection with its second motion. Upon remand of the present case, however, the trial court's rulings will have no effect since a reversal abrogates the judgment or decree reversed and leaves the case as it stood prior to the entry thereof. (*The Willett Co. v. Carpentier* (1954), 4 Ill. 2d 407, 123 N.E.2d 308; *People ex rel. Scott v. Police Hall of Fame, Inc.* (1979), 69 Ill. App. 3d 501, 387 N.E.2d 856; *Loy v. Booth* (1974), 16 Ill. App. 3d 1077, 307 N.E.2d 414.) Thus, no substantive rulings will have been entered, and either party may at that point apply for a change of venue.

For the reasons stated, the judgment of the trial court is reversed, and the cause is remanded for further proceedings not inconsistent with the views expressed herein.

Reversed and remanded.

LORENZ and WILSON, JJ., concur.