Norton SARNOFF and Carl Fletcher, Plaintiff-Appellee and Plaintiff-Appellant,

v.

AMERICAN HOME PRODUCTS CORPORATION, Defendant-Appellant-Appellee.

Nos. 85–1833, 85–1880, 85–2547 and 85–2576.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1986.

Decided Aug. 20, 1986.

Lewis Perkiss, New York City, for defendant-appellant-appellee.

Robert K. Blain, Altheimer & Gray, Chicago, Ill., for plaintiff-appellee and plaintiff-appellant.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

This breach of contract suit, brought in federal court under the diversity jurisdiction, pits Norton Sarnoff and Carl Fletcher against their former employer, American Home Products Corporation. Fletcher was dismissed from the case on jurisdictional grounds but Sarnoff obtained summary judgment, 607 F.Supp. 77 (N.D.Ill.1985), and later an award of attorney's fees and an order directing American Home Products to issue him the shares of stock that he had sued for. Fletcher appeals from his dismissal and American Home Products from the award of stock and attorney's fees to Sarnoff.

Fletcher and Sarnoff were executives of an Illinois corporation, E–Z Por, which

American Home Products bought in 1979. The headquarters of American Home Products is in New York, but the two executives remained in Illinois. In 1981 American Home Products, which had an incentive plan under which a committee of outside directors made awards to outstanding employees, wrote Fletcher and Sarnoff that the committee had awarded them 150 and 600 shares of stock (respectively), for 1980, to be delivered in 10 annual installments beginning at the end of their employment. The letter told the recipient to read the conditions of the award as disclosed in the incentive award plan, a copy of which was enclosed; stated that any legal questions arising under the plan would be decided under the law of New York; and requested the recipient to sign and return a copy of the letter in order to signify acknowledgment of the notification and "acceptance of New York Law as governing Plan interpretations." One of the conditions of the plan was that if the recipient left the employ of American Home Products and became an officer, director, employee, owner, or partner of an entity that "conducts a business in competition with the Company or renders a service (including, without limitation, advertising agencies and business consultants) to competitors with any portion of the business of the Company," he would forfeit the portion of the award not yet delivered to him. To get the entire award the former employee would thus have to comply with the no-competition condition for 10 years after he left American Home Products.

Fletcher and Sarnoff signed and returned the copies of the letter and shortly afterward quit American Home Products. Sarnoff formed and Fletcher became an employee of Ensar Corporation, which sells housewares, including bottle openers and can openers. From Fletcher and Sarnoff's answers to a questionnaire that American Home Products circulated in December 1981 to former employees who had received awards under the incentive plan, the committee concluded that the two of them (along with 11 others out of a total of 400 recipients) had forfeited their awards, be-

cause Ensar's openers competed with housewares made by American Home Products. This determination was made in January 1982, before Sarnoff and Fletcher had received the first installments of their awards. Their suit charges that the no-competition condition is invalid and in any event was misapplied; the district judge agreed with the first contention, so did not have to consider the second. But he dismissed Fletcher on jurisdictional grounds, and we shall first consider whether that dismissal was correct.

■ The joint complaint of Fletcher and Sarnoff, filed in February 1983, alleges that "the matter in controversy exceeds the sum or value of $10,000 exclusive of interests and costs." Except for an unimportant change in punctuation, this is the language in which 28 U.S.C. § 1332(a) defines the minimum amount in controversy requirement in diversity cases. Yet actually the complaint contains a latent ambiguity; for when there is more than one plaintiff each one's claim must exceed the statutory minimum. *Hixon v. Sherwin-Williams Co.*, 671 F.2d 1005, 1007–09 (7th Cir.1982). The claims cannot be aggregated, as the complaint in this case appears to do. In October 1984, Fletcher and Sarnoff moved for summary judgment and in their motion stated that as of that time the shares Fletcher was seeking were worth a total of $8,579.36 and the shares Sarnoff was seeking $34,467.08, and that these amounts plus attorney's fees were the plaintiffs' damages. The district judge advised the parties in December that "Fletcher could be dismissed for failure to allege the minimum jurisdictional amount." 607 F.Supp. at 81 n. 5. In response, the parties stipulated that the court had jurisdiction over Fletcher as a "pendent party." As the judge noted, however, the parties could not confer federal jurisdiction by stipulation, and he went on to hold that Fletcher could not be retained in the case under the pendent party concept.

Although it has never been determined whether Fletcher's claim was worth more than $10,000, we think his response to the

judge's threat to dismiss forfeited his right to maintain suit under section 1332(a). Fletcher could have responded to the judge by pointing out that the relevant time for determining whether the requirement was satisfied was when the complaint was filed, not almost two years later when the motion for summary judgment was filed. See, e.g., *Sellers v. O'Connell*, 701 F.2d 575, 578 (6th Cir.1983); 14A Wright, Miller & Cooper, Federal Practice and Procedure § 3702, at p. 28 (2d ed. 1985). He could have pointed out that the complaint asked for attorney's fees under Ill.Rev.Stat. ch. 13, § 13, and that "where a litigant has a right, based on contract, statute, or other legal authority, to an award of attorney's fees if he prevails in the litigation, a reasonable estimate of those fees may be included in determining whether the jurisdictional minimum is satisfied. *Batts Restaurant, Inc. v. Commercial Ins. Co. of Newark*, 406 F.2d 118, 120 (7th Cir.1969)." *Ross v. Inter-Ocean Ins. Co.*, 693 F.2d 659, 661 (7th Cir.1982). The district judge awarded Sarnoff almost $18,000 in attorney's fees and costs; presumably most of this amount was for attorney's fees. If Fletcher had won (and if the attorney's fee statute is applicable in a case of this sort), he too might have been entitled to a reasonable attorney's fee, and maybe it would have been large enough to carry him over the $10,000 hump.

▬▬▬ That depends, however, on what the shares were worth when the suit was filed, and also on whether the value of the shares approximates the amount in controversy between Fletcher and the defendant. It may not. The damages estimated in the motion for summary judgment were derived by multiplying the price of American Home Products' stock when the motion was filed by the total number of shares to which the plaintiffs believed themselves entitled. But the plaintiffs have never said they were entitled to all the shares at once. At best, they were entitled to them in equal annual installments over 10 years; this was what the district judge, who in the end granted specific performance rather than awarding damages, ordered in Sarnoff's

suit. The present value of Fletcher's shares may have been a lot less than $8,600 when the complaint was filed. When what is claimed is a future benefit, the valuation of the claim for purposes of jurisdiction (as for purposes of computing the lump sum of damages to which a winning plaintiff is entitled in compensation for losing the future benefit) requires discounting the future benefit to its present value. See *Weinberger v. Wiesenfeld*, 420 U.S. 636, 642 n. 10, 95 S.Ct. 1225, 1230 n. 10, 43 L.Ed.2d 514 (1975); 14A Wright, Miller & Cooper, *supra*, § 3710 at p. 172. At a discount rate of 10 percent the present value of $8,600 received in equal annual installments over 10 years is only $5,284, though apparently by the time the plaintiffs got around to suing they were already owed (assuming that the condition not to compete was either invalid or inapplicable) two installments of stock, and this would raise the present value in the example to $6,308. A further wrinkle is that prejudgment interest may sometimes count toward the jurisdictional minimum, notwithstanding the words "exclusive of interest and costs" in section 1332(a). See 14A Wright, Miller & Cooper, *supra*, § 3712, at pp. 179–83.

Even after discounting to present value, Sarnoff's shares, plus the attorney's fees that he might reasonably expect to get reimbursed if he won (always assuming that the attorney's fee statute is applicable to this case, an issue we shall not have to decide), almost certainly had a value greater than the statutory minimum. But there was sufficient doubt whether Fletcher's claim did to entitle the district judge to put Fletcher to his proof, especially given the ambiguity of the complaint regarding the size of that claim. See *Crawford v. United States*, 796 F.2d 924, 928–29 (7th Cir.1986). Fletcher, however, refused the judge's invitation to introduce evidence on the matter. Instead he decided to put all his eggs in the pendent party basket. That is the only sense we can make out of the stipulation that the parties filed in response to the district judge's questioning of jurisdiction

(the only response they made to it): "The parties consent and agree that the Court has jurisdiction of this action in that the issues of fact and law as between each of the plaintiffs and the defendant are the same; the decision of this Court as to all of these issues will assure a consistent and uniform holding and avoid the possibility of inconsistent, contradictory and conflicting decisions on the very same issues by two different courts and will avoid additional and unnecessary litigation on the same issues."

■■■ Section 1653 of the Judicial Code, which allows defective allegations of jurisdiction to be corrected even on appeal, can thus be of no help to Fletcher. His problem is not just pleading but also proof; we simply do not know whether his claim met the statutory minimum at the relevant time. He can take no comfort from the cases that allow jurisdiction to be retained if proper under a statute different from that on which the parties had relied, see, e.g., *Association of American Medical Colleges v. Califano*, 569 F.2d 101, 111 (D.C.Cir.1977); it is a question of fact, impossible to answer on the record before us, whether section 1332(a) is available to Fletcher. See *Baer v. United Services Automobile Ass'n*, 503 F.2d 393, 397 (2d Cir.1974). Granted, if a jurisdictional problem is not noticed till the appellate level, we can do two things besides dismissing. If the problem is easily soluble by affidavit (as of citizenship), we can allow the parties to supplement the record in this court. See, e.g., *Goldstick v. ICM Realty*, 788 F.2d 456, 458 (7th Cir.1986); cf. 28 U.S.C. § 2108. If the problem involves greater factual uncertainty, we can remand the case to give the parties a chance to introduce evidence in the district court and obtain a jurisdictional finding by the district judge. See, e.g., *Jason's Foods, Inc. v. Peter Eckrich & Sons, Inc.*, 768 F.2d 189 (7th Cir.1985). But either course presupposes that the parties, not suspecting a jurisdictional difficulty, had no reasonable opportunity to cure it before the appeal. Here the parties had fair warning in the district court and failed to act on it; enough is enough.

■■■ The district judge was correct to reject the pendent party concept as an alternative basis for jurisdiction over Fletcher's claim. *Hixon v. Sherwin-Williams Co., supra*, 671 F.2d at 1007–09, held that the concept cannot be used to bring into the federal courts a diversity claim that does not satisfy the amount in controversy requirement. Granted, the facts in *Hixon* made it a less appealing case for pendent party jurisdiction than the facts here. The pendent party's claim was petty (less than $900), yet raised difficult issues of state law different from those raised by the main claim. Fletcher's claim is more substantial and raises the same legal and factual issues as Sarnoff's. On the other hand, Fletcher like Hixon is a resident of the state in whose courts he would have to sue if thrown out of federal court; so he cannot appeal to the policy underlying the diversity jurisdiction.

Even if we were minded to carve an exception to *Hixon* for cases where the main claim and the pendent party's claim are identical, we could not do so. Our decision in *Hixon* was compelled by the Supreme Court's decision in *Zahn v. International Paper Co.*, 414 U.S. 291, 292, 300–02, 94 S.Ct. 505, 511–12, 38 L.Ed.2d 511 (1973), which had held that even if one or more of the named plaintiffs in a class action meets the amount in controversy requirement, and even though a class action cannot be maintained unless the claims of the class members have a high degree of factual and legal commonality, see Fed.R. Civ.P. 23(b)(3), those claims cannot be piggybacked onto the claims that exceed the jurisdictional minimum. Thus *Zahn* necessarily rejected pendent party jurisdiction for identical claims; and thus, rather than occupying new ground, *Hixon* was an *a fortiori* application of *Zahn*. *Hixon* in fact anticipated and rejected the suggestion that identical substantive claims would justify pendent party jurisdiction in a diversity case. See 671 F.2d at 1008.

Fletcher's claim was properly dismissed and we turn to Sarnoff's. The district judge held that (1) the choice of law provision was unenforceable under any state's law, because not supported by consideration; (2) Illinois would in any event not enforce a choice of law provision (even though valid in the state where made) that produced a result contrary to the public policy of Illinois, and the judge thought the no-competition condition in American Home Products' incentive award plan would do this; (3) even under New York law, the condition was invalid as contrary to public policy.

■ The first ground, lack of consideration, assumes that every provision in a contract must have a separately bargained for and stated consideration. It need not. Restatement (Second) of Contracts, § 80(2) (1979). The letter from American Home Products to Sarnoff announcing his award was the offer of a substantial financial benefit conditioned on Sarnoff's refraining from competition with American Home Products and agreeing to submit any dispute over the matter to governance by New York law. Thus, two different kinds of acceptance were required. One was acceptance by conduct—that is, by not competing; in this respect the offer was of a unilateral contract, like offering a reward for finding and returning one's lost cat. The other was acceptance by a promise concerning which state's law would govern disputes. The consideration for the package of conduct and promise was the shares.

Sarnoff argues that there was no consideration because he had already been awarded the shares. But they were not part of his formal compensation package. He could work like a dog and still not obtain any incentive award; the award was in the company's discretion. No doubt Sarnoff thought he had a good chance to get the award if he worked hard. As the word "incentive" implies, the purpose of such awards is to encourage hard work and would fail if they were random. But an expectation is not an entitlement. See, e.g., *Enis v. Continental Illinois Nat'l*

*Bank & Trust Co.*, 795 F.2d 39 (7th Cir. 1986). Employer and employee often prefer to rely on market incentives rather than on enforceable contractual obligations to motivate the performance of their respective undertakings; there is no other plausible explanation for the prevalence of employment at will in the private nonunionized sector. See Epstein, *In Defense of the Contract at Will*, 51 U.Chi.L.Rev. 947 (1984). Sarnoff had no contractual—that is, legally enforceable—entitlement to the shares until the company offered them and he accepted the conditions attached to the offer.

■ The next question is whether the parties' choice of law, even if (as we believe) valid under New York law, is enforceable in Illinois. In addressing this question the district judge quite rightly applied Illinois' conflict of law rules; in a diversity case the choice of which state's substantive law to apply is determined by the conflicts rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 531 (7th Cir.1985). But with all due respect for the district judge's views on the content of those rules, see *Enis v. Continental Ill. Nat'l Bank & Trust Co.*, supra, 795 F.2d at 40 ("our policy is to give some though of course not complete deference to the interpretation of state law by a district judge sitting in the state whose law is in question"), we disagree with his conclusion that Illinois courts would refuse to enforce the choice of law provision.

They might refuse to enforce the no-competition condition itself—in a contract governed by Illinois law. Although the condition is carefully designed to avoid being classified as a covenant not to compete—there is no promise by the employee not to compete, only a condition forfeiting his rights if he does compete—Illinois, which like other states requires that a covenant not to compete be reasonable to be enforceable, see, e.g., *Reinhardt Printing Co. v. Feld*, 142 Ill.App.3d 9, 96 Ill.Dec. 97, 101–

02, 490 N.E.2d 1302, 1306–07 (1986), might pierce the formal wrappings, thinking it an unimportant detail whether Sarnoff received a carrot for not competing or was hit over the head with a stick (an injunction) for competing. The contract in *Johnson v. Country Life Ins. Co.*, 12 Ill.App.3d 158, 300 N.E.2d 11 (1973), contained a provision, which the court treated like a covenant not to compete, whereby the employee, a life insurance agent, would forfeit certain commissions if he quit and went into competition with his former employer. The case may be distinguishable from this one, since the earnings that would have been forfeited were part of Johnson's regular compensation, and not just a bonus; we shall see that a later decision reads *Johnson* narrowly. But suppose Illinois would treat the condition in the present case as a form of covenant not to compete. Then it might take the next step and decide that the condition was unreasonable because of its duration (10 years), worldwide scope, and extremely broad definition of competition with American Home Products as including the supplying of a competitor of American Home Products. But this is not a question we need decide. The no-competition condition might violate Illinois law yet not be so obnoxious to the public policy of Illinois that an Illinois court would refuse to enforce it despite the parties' agreement that New York law would govern.

■ Illinois courts, which have long allowed parties to "substitute the laws of another place or country," will enforce the substituted law "where it is not dangerous, inconvenient, immoral, nor contrary to the public policy of the local [i.e., Illinois] government." *McAllister v. Smith*, 17 Ill. 328, 333 (1856). As illustrations of laws that Illinois would enforce *McAllister* lists marriage and divorce laws, laws allowing lotteries, and laws allowing loans to be made on terms that would be considered usurious in Illinois. *Id.* at 334. *McCallister* was followed in *Reighley v. Continental Ill. Nat'l Bank & Trust Co.*, 390 Ill. 242, 247–48, 61 N.E.2d 29, 33 (1945) (marriage annulment), and *Mell v. Goodbody & Co.*, 10 Ill.App.3d 809, 813–14, 295 N.E.2d 97, 99–100 (1973) (usury). Two other cases, *Hofeld v. Nationwide Life Ins. Co.*, 59 Ill.2d 522, 528, 322 N.E.2d 454, 458 (1975), and *Swanberg v. Mutual Benefit Life Ins. Co.*, 79 Ill.App.3d 81, 84–85, 34 Ill.Dec. 624, 626–27, 398 N.E.2d 299, 301–02 (1979), support *McCallister* in dictum while suggesting (also in dictum) that any public policy declared in an Illinois statute might override the parties' choice of law, and that their choice of law might also be disregarded if the party resisting its application had been offered the contract on a take it or leave it basis. The first suggestion is not easy to square with the results in the other cases we have cited, all of which involved an Illinois statute inconsistent with the foreign law chosen by the parties; but in any event it cannot help Sarnoff, since Illinois has no statute regulating covenants not to compete or conditions that might be assimilated to such covenants. Only common law policy is involved and it is not of such strength as would override a choice of law provision under the standard of *McCallister*.

In suggesting that a choice of law provision might not be enforced if it was part of a contract offered on a take it or leave it basis to the party resisting enforcement, *Hofeld* and *Swanberg* presumably were alluding to the doctrine of unconscionability, which the Restatement (Second) of Contracts § 208, comment d (1979), explains as follows: "A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party *had no meaningful choice*, no real alternative, or did not in fact assent or appear to assent to the unfair terms." (Emphasis added.) As this language and, more important, the Illinois cases make clear, refusing to enforce a contract in whole or part because it is

unconscionable requires more than a showing that the contract was a uniform contract between an individual and a corporation; there must be a showing of deception, lack of agreement, compulsion, or some other element of real oppression. See *Dana Point Condominium Ass'n, Inc. v. Keystone Service Co.*, 141 Ill.App.3d 916, 920, 96 Ill.Dec. 249, 252–53, 491 N.E.2d 63, 66–67 (Ill.App.1986); *McRand, Inc. v. Van Beelen*, 138 Ill.App.3d 1045, 1056, 93 Ill. Dec. 471, 479, 486 N.E.2d 1306, 1314 (1985); *In re Marriage of Lee*, 135 Ill.App.3d 509, 514, 90 Ill.Dec. 245, 248, 481 N.E.2d 1045, 1048 (1985); cf. *Amoco Oil Co. v. Ashcraft*, 791 F.2d 519, 522–23 (7th Cir.1986). No such showing was made here.

Sarnoff was a highly paid executive and the award letter short and simply worded (the opposite of the usual insurance contract, for example); he was not likely to be deceived by its contents. Nor was the choice of law provision objectively unreasonable, since New York law was in fact the parties' logical choice to govern any dispute arising out of the award contract. Whether Illinois or New York or some other state has the most "contacts" with a particular transaction involving American Home Products' far-flung work force might be important if there were no contractual choice of law provision; but American Home Products was reasonable in wanting all of its legal obligations with its former employees to be governed by the law of the headquarters state if the employees could be persuaded to agree. Hundreds of former employees had received these incentive awards and were therefore subject to the no-competition condition, and life would be much simpler for American Home Products if all the awards were governed by the law of the state with which its legal department was most familiar and in which the committee administering the incentive awards met. New York is not a legal backwater, nor Sarnoff a humble workingman being subjected to a condition he could not possibly understand—a condition calculated to deceive yet somehow enforceable under New York law. Two cases which cite *Hofeld* for the proposition that

Illinois courts will enforce contractual choice of law provisions involve choosing New York law. See *Kardolrac Industries Corp. v. Wang Laboratories, Inc.*, 135 Ill. App.3d 919, 921, 90 Ill.Dec. 567, 569, 482 N.E.2d 386, 388 (1985); *United Nuclear Corp. v. Energy Conversion Devices, Inc.*, 110 Ill.App.3d 88, 109 n. 3, 65 Ill.Dec. 649, 663 n. 3, 441 N.E.2d 1163, 1177 n. 3 (1982).

Despite all this, we may assume that Illinois would not enforce the choice of law provision if there were a danger that Sarnoff would be made a pauper and become a dependent of the Illinois Department of Welfare because he must choose between competing with American Home Products and losing his incentive award or that the price of housewares in Illinois might rise because other former employees might refrain from competing with American Home Products in order to hold on to their awards. But these dangers are too remote to warrant an inference that Illinois would refuse to enforce what on its face appears to be a reasonable choice of law provision— reasonable given not only the circumstances of its adoption and the relationship of the parties to the state whose law was chosen but also the proximity between the public policies of the competing jurisdictions. Although we have assumed that Illinois would not enforce the condition that bars Sarnoff from receiving his award of stock, the assumption rests on a prediction, plausible but by no means certain, that Illinois would classify the condition as a covenant not to compete, or if not would apply the same legal standard. *Johnson v. Country Life Ins. Co., supra,* the principal authority for the prediction, was read narrowly in *Parenti v. Wytmar & Co.*, 49 Ill.App.3d 860, 868, 7 Ill.Dec. 618, 624, 364 N.E.2d 909, 915 (1977)—perhaps confined to its facts. The uncertainty whether the condition would be lawful under Illinois law is some evidence that New York law, while it may diverge from Illinois law, is not so repugnant to that law that Illinois courts would refuse to enforce the condition.

So New York law governs the lawfulness of the non-competition condition, and the

last question we need to decide is whether the New York courts would refuse to enforce such a condition if it was unreasonable, as they would do if instead of being a condition of receiving monetary benefits it was a covenant not to compete. *Kristt v. Whelan*, 4 A.D.2d 195, 164 N.Y.S.2d 239 (1957), aff'd without opinion, 5 N.Y.2d 807, 155 N.E.2d 116, 181 N.Y.S.2d 205 (1958), holds that such a condition is enforceable, apparently without regard to its scope and duration, and hence to its reasonableness. See generally Sullivan, *Revisiting the "Neglected Stepchild": Antitrust Treatment of Postemployment Restraints of Trade*, 1977 U.Ill.L.Forum 621, 638–39. In defense of this result it can be pointed out that in the case of a covenant not to compete the employee who quits and goes into competition with his former employer can be enjoined from competing; with the condition he cannot be, though if the forfeiture triggered by the condition's coming to pass is great enough, the inducement to avoid competing with his former employer may be as strong as the threat of a contempt judgment for violation of an injunction would be—or at least strong enough.

But against this distinction it can be argued that under either arrangement, which is to say whatever the initial assignment of rights—whether the employer has the right to prevent the employee from competing or the employee the right to compete but at some previously determined price—the parties, because there are only two of them (so that the costs of transacting should not be prohibitive), will be able to bargain their way to the position that maximizes their joint wealth. See Coase, *The Problem of Social Cost*, 3 J.Law & Econ. 1 (1960). Hence the amount of competition should not be affected. The only difference—but an important one given the paternalistic thinking that has been so prominent from the start in judicial thinking about covenants not to compete, see, e.g., *Mitchel v. Reynolds*, 1 P.Wms. 181, 24 Eng.Rep. 347 (K.B. 1711)—is that at the moment when the employee must make the decision that will trigger the covenant or condition, he has a more limited set of choices under the former than under the latter. The covenant not to compete prevents him from competing unless he buys back the covenant from his former employer, whereas the condition gives him a choice between competing and receiving compensation for not competing—a choice, it might appear, between a cushion and a soft place. This distinction, however, is nowhere alluded to in *Kristt*, and ignores the fact that if the forfeiture is big enough it may prevent the employee from competing just as the covenant would do. And presumably the employee would have been compensated in advance for agreeing to a covenant that would restrict his freedom of future action. Moreover, the issue of reasonableness is barely discussed in *Kristt*; indeed, the entire discussion of the no-competition condition is perfunctory. And the decision is only that of an intermediate court, though it was affirmed by New York's highest court.

In *Bradford v. New York Times Co.*, 501 F.2d 51, 55–56 (2d Cir.1974), the Second Circuit predicted the demise of *Kristt*, because intervening decisions had emphasized that covenants not to compete must be reasonable to be enforced. But the whole point of *Kristt* was to distinguish between a covenant not to compete, whereby a former employee could be enjoined from competing with his former employer, and a condition whereby the former employee would merely forfeit a monetary benefit if he went into competition with his former employer. We might not think the distinction terribly significant as an original matter but the court in *Kristt* thought it decisive, as did the Tenth Circuit in *Cinelli v. American Home Products Corp.*, 785 F.2d 264, 266 (10th Cir.1986), which held that the same condition involved in this case did not violate federal antitrust law. *Bradford* does not discuss the distinction between condition and covenant at all; it lumps all "occupational limitations upon former employees" together. 501 F.2d at 56.

Five years later New York's highest court decided *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d

84, 397 N.E.2d 358, 421 N.Y.S.2d 847 (1979), which cited *Kristt* with apparent approval while confining it to cases where the employee had quit or been fired for cause. Thus if the employee had been fired without cause, the no-competition condition would be enforced only if it was reasonable; but if the employee had quit voluntarily, the condition was enforceable whether or not reasonable. Although since Sarnoff quit voluntarily it would seem that *Kristt* rather than *Post* would be the controlling precedent, the district judge thought *Post* had "enunciated a major limitation of the rule stated in *Kristt*" and that "such limitations often presage the reversal of a rule rather than its reaffirmation." 607 F.Supp. at 80. But there is nothing in *Post* to suggest the former rather than the latter. The distinction between the voluntary and involuntary termination of employment may be thin, but it is not irrational. In the case of voluntary termination, no inference of oppression of the employee is possible. It is also likelier than in the case of involuntary termination that the employee will decide to compete and forfeit his benefits. If he is fired unexpectedly, the timing may be all wrong for him to go into competition with his former employer.

■ The district judge described the approving references to *Kristt* in *Post* as "dicta." This, if true, is less damaging than he thought. Having been affirmed by New York's highest court, *Kristt* was significant authority in its own right; and even a nonappealed decision of an intermediate state court is significant evidence of what the state's law is. *Commissioner v. Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Williams, McCarthy, Kinley, Rudy & Picha v. Northwestern National Ins. Group*, 750 F.2d 619, 624 (7th Cir.1984). But is it true that the approving references to *Kristt* in *Post* are dicta? A dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court

that uttered it. The holding of *Post* is that a no-competition condition is unenforceable if it is unreasonable *and* if the employee was fired without cause. Since that is a stronger case for refusing to enforce such a condition than was *Kristt* itself, which involved a similar condition but an employee who had quit voluntarily, the court in *Post* did not have to reexamine *Kristt*. So far as the integrity of the *Post* opinion is concerned it would have made no difference whether the court had said, "We agree with *Kristt* but this case is different," or had said, "We disagree with *Kristt* and this is an even stronger case for invalidating the no-competition condition."

So the apparent approval of *Kristt* by *Post* was indeed a dictum, but it is still some evidence of New York law—better evidence than *Bradford*. Moreover, *Kristt* is authority in its own right, as we said. Every decision since *Post* and *Bradford* were decided (not that there are many) treats *Kristt* as good law. See *Wise v. Transco, Inc.*, 73 A.D.2d 1039, 425 N.Y. S.2d 434 (1980); *Murphy v. Gutfreund*, 583 F.Supp. 957, 962–65 (S.D.N.Y.1984); *Diakoff v. American Re-Ins. Co.*, 492 F.Supp. 1115, 1121–23 (S.D.N.Y.1980); *Roesgen v. American Home Products Corp.*, 719 F.2d 319, 321 n. 3 (9th Cir.1983); cf. *Golden v. Kentile Floors, Inc.*, 512 F.2d 838, 844–45 (5th Cir.1975) (pre-*Post*).

■ The noncompetition condition was valid; there remains the question, not yet passed on by the district court, whether the incentive award committee acted unreasonably in finding that Sarnoff's company was competing with American Home Products. If not, American Home Products had no right under the plan (made binding by Sarnoff's acceptance of the letter offer) to forfeit Sarnoff's award. Judicial review of a committee, as of an arbitrator, is extremely limited. See, e.g., *Gitelson v. Du Pont*, 17 N.Y.2d 46, 215 N.E.2d 336, 268 N.Y.S.2d 11 (1966); *Meckes v. Cina*, 75 A.D.2d 470, 429 N.Y.S.2d 936 (1980), aff'd without opinion, 54 N.Y.2d 894, 429 N.E.2d 425, 444 N.Y.S.2d 918 (1981); *Pasternack*

*v. Diamond,* 3 A.D.2d 422, 161 N.Y.S.2d 277 (1957) (per curiam), aff'd without opinion, 5 N.Y.2d 770, 154 N.E.2d 141, 179 N.Y.S.2d 864 (1958); *Cinelli v. American Home Products Corp., supra,* 785 F.2d at 267 (New York law); *Gehrhardt v. General Motors Corp.,* 581 F.2d 7, 11 (2d Cir. 1978) (same). But Sarnoff has yet to receive such review of the committee's decision as he is entitled to, so the case must be remanded. We need not decide whether the district court was correct in awarding Sarnoff his attorney's fees under the Illinois statute cited earlier. The statute is limited to prevailing parties; Sarnoff has not yet prevailed and may never.

The judgment dismissing Fletcher's claim is affirmed; the judgment for Sarnoff is reversed and his case returned to the district court for further proceedings consistent with this opinion. Costs in this court are awarded to the defendant and are to be divided equally by the two plaintiffs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.