**VENCOR, INC., Plaintiff,**

v.

**David O. WEBB, Defendant.**

No. 93 C 20138.

United States District Court, N.D. Illinois, W.D.

July 20, 1993.

Michael Conway, Hopkins & Sutter, P.C., Chicago, IL, for plaintiff.

Thomas Campbell, Gardner, Carton & Douglas, Chicago, IL, for defendant.

### *ORDER*

REINHARD, District Judge.

### INTRODUCTION

Plaintiff, Vencor, Inc. (Vencor), filed a complaint for injunctive and other relief and, subsequently a motion seeking to preliminarily enjoin a former employee, defendant, David O. Webb (Webb), from working for his new employer, Transitional Hospital Corp. (THC). Jurisdiction is pursuant to 28 U.S.C. § 1332. Venue in this court is proper under 28 U.S.C. § 1391(a) as Webb was a resident of this district at the time of filing and the claim arose here. The court has expedited discovery and held a prompt hearing on the motion for preliminary injunction.[1] Having heard the testimony of witnesses and received exhibits into evidence, the court hereby enters its findings of fact and conclusions of law.

### FACTS

The following is a summary of the pertinent facts adduced at the hearing on the motion for a preliminary injunction. Vencor is a Delaware corporation with its principal

---

1. While the parties have conducted substantial discovery for this hearing, they were unwilling to give up the right to additional discovery and, thus, convert the hearing to one for a permanent injunction.

place of business in Louisville, Kentucky. It owns and operates twenty-six hospitals, most of which are certified to provide long-term acute care to chronically ill patients. Certification is necessary to receive Medicare reimbursement. Vencor considers itself a pioneer in the field of establishing specialized long-term acute care hospitals, and 98–99% of its business is comprised of long-term acute care. It opened its first such hospital in 1986 and was the first corporation to do so.

Its hospitals are located in Florida, Georgia, Michigan, Tennessee, Indiana, Illinois, Missouri, Texas, Oklahoma, Colorado, Arizona and California. It has had patients in those hospitals from sixteen states other than those in which its hospitals are located. It also obtains patients through national referrals from Medicare and the American Association of Retired Persons.

Vencor has three principal competitors, including THC, that operate long-term acute care hospitals. THC currently has three such facilities, in Louisiana, Texas and Florida,[2] that are in the process of obtaining certification. Vencor considers THC to be its direct competitor. THC issued two press releases in May and July 1992 which refer to Vencor as a competitor and state that "other markets are being examined * * * to determine their suitability for THC's products." (Pl.Exh. 13) Excerpts from Webb's deposition were admitted as admissions and establish that THC operates long-term acute care facilities and has entered the same health care market niche as Vencor.

Long-term acute care is essentially concerned with providing care to chronically ill patients who require long periods of time to recover and are in need of life support systems of one degree or another. The typical hospital stay for one of these patients is over twenty-five days. Because of the different regulations governing Medicare and health insurance reimbursement for these types of patients, most hospitals do not provide this type of care.

Several corporate officials of Vencor testified regarding various manuals and documents created by Vencor and used in the operation of their long-term acute care hospitals. According to Frank Anastasia, Vencor's director of operations, Vencor personnel developed an administrative policies and procedures manual (Pl.Exh. 6) in May 1990 at an estimated labor cost of about $1,000,000. The manual is concerned with the operations of a long-term acute care facility and would not be useful for operating a short-term acute care hospital. The manual is kept in the administrator's office of each hospital, contains a preamble concerning the confidentiality of the manual and has individual pages that are labelled "[c]onfidential and proprietary information." A cover letter regarding the manual was given to each hospital administrator in June 1992. The letter did not discuss where the manual was to be kept, who could review it or whether there was a sign-out procedure. The four members of each hospital's administrative team, the department directors and supervisors all had access to the administrative manual.

W. Earl Reed, the vice-president of finance and development at Vencor, described several financial documents created and utilized by Vencor in the operation of its long-term acute care hospitals. The full-time equivalent (FTE) report (Pl.Exh. 8) is unique to long-term acute care facilities. While Vencor was required to send a twelve-month cost report to Medicare, such report was not as detailed as the FTE report. The cost per patient day report (Pl.Exh. 9) was created by Vencor and had never been done before as to long-term acute care. Reed also developed the net revenue schedule (Pl.Exh. 10) which showed how much was paid to Vencor per day for each type of patient. It is designed to be used for long-term acute care hospitals. The net income analysis and recap (Pl.Exhs. 11 and 11a) was also designed for use in a long-term acute care facility to measure income by payor class. Reed considered all of these documents to be confidential as to their format and the information contained therein because they took six years to develop and had never been prepared for a long-term acute care hospital before.

James Hermes, a director of hospital accounting, testified that he assisted in the

2. Vencor has a hospital in the same metropolitan area as THC in Texas and Florida.

preparation of the financial policies and procedures manual (Pl.Exh. 7) for Vencor. The purpose of the manual was to assist the assistant administrators of finance at each hospital to maximize net revenues and to collect debts owed. The manual was based on the procedures used at Vencor's Dallas facility combined with the input of various financial personnel, including Hermes. It cost about $250,000 in salary time to develop. Hermes did not know of any other policies or procedures from other hospitals having been used in the creation of the manual. Hermes considered the financial manual to be confidential because it contained examples of ways to avoid losing money and would help avoid certain start-up costs of a competitor.

Vencor also used a "chargemaster" which contained standardized charges and standardized terminology for the various procedures utilized at Vencor's hospitals. Additionally, Vencor had a consolidated charge history (Pl.Exh. 5) which is a computer program developed by a third party in conjunction with Vencor to show revenues and costs by department and procedure for the various hospitals.[3] Hermes considered the consolidated charge history to be confidential because a competitor could use the information therein to create a marketing plan.

Webb was the assistant administrator of finance at Vencor's hospital in Sycamore, Illinois. In that position he was familiar with the various financial documents Vencor used. He had used similar types of documents at two previous employers and considered Vencor's version as being simpler and less detailed. He also referred to the administrative policies and procedures manual occasionally and was sent a draft copy of the financial policies and procedures manual in January 1993 to review.

In June 1992, Webb received a document entitled "CONFIDENTIALITY AND NON–COMPETITION AGREEMENT." Webb signed the agreement on July 8, 1992, and received $1,000 as consideration for doing so. The agreement provides, in relevant part, that Webb will not, for a twelve-month period after leaving Vencor, "engage, directly or indirectly, within the continental United States (the 'Geographical Territory'), in any 'Competitive Business.' " Competitive business is defined in the agreement as "any business or activity conducted by the Company as of the date of Employee's termination from the Company, including, but not limited to, providing long-term hospital care to medically complex, chronically-ill patients." In a letter to Webb dated July 8, 1992, the vice-president of operations "clarified" the term "competitive business" to "mean *solely* the provision of long-term hospital care to medically complex, chronically ill patients." (emphasis in original) (Pl.Exh. 2)

The agreement further prohibits the employee from divulging any confidential information. Confidential information, in turn, is defined as "all proprietary information concerning the Company's present and proposed businesses, operating methodologies, referral sources, assets, marketing strategies, financial and clinical matters, including all procedures, systems and techniques used by the Company in evaluating its operations and the quality of its services, all financial data and pricing information relevant to the Company's operations and all business and marketing plans and financial protections." Lastly, the agreement states that it "shall be governed by, and shall be construed and enforced in accordance with" Kentucky law.

In April 1993, Webb contacted Gene Winters at THC, a former assistant administrator of finance at one of Vencor's hospitals, to inquire about possible employment with THC. On or about April 30, 1993, Webb interviewed at THC's offices in Atlanta, Georgia. He also submitted a resume (Pl. Exh. 3) which contained, among other information, a detailed outline of his duties and responsibilities at Vencor's Sycamore hospital. According to Webb, he sent this same resume to various other prospective employers.

---

3. While the evidence established that Webb requested and received permission to obtain a consolidated charge history just prior to the time he left, there is no evidence he actually reviewed the document via computer or printed the document. Moreover, Webb denied printing the document. Hermes considered it appropriate under the circumstances that Webb requested the information.

Webb accepted a position with THC as manager of its central business services. In that position, he is in charge of billings and collections. He denied taking any Vencor documents and denied using any of Vencor's alleged confidential information in his job at THC. Neither has he disclosed any information considered proprietary or confidential by Vencor. Portions of his deposition were admitted wherein he testified that part of his responsibilities at THC were to develop methodologies used to collect accounts, review the computerized billing system and design documents related to patient billing. He admitted at the hearing that he considered the Vencor manuals and financial documents to be confidential.

Thomas McNaull testified as an expert on behalf of Webb. He is the president of American Med Trust, a hospital management company, and is a former vice-president of financial operations for a group of about 100 hospitals. His experience has been in managing over 450 hospitals, but he has never worked or consulted for a hospital providing solely long-term care. He reviewed the administrative and financial manuals, concluded that they were the type generally required by many hospitals and contained matters covered by many hospital manuals, and opined that the format of neither manual was unique. He also was of the opinion that none of the financial reports used by Vencor were unique and that other hospitals used similar reports. He considered the consolidated charge history as unique and not available to other hospitals.

Lastly, the parties stipulated that THC has hired several other former Vencor employees.

## DISCUSSION

■ As a threshold matter, a party seeking a preliminary injunction must demonstrate: (1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied. *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992). If the moving party cannot establish either of these prerequisites, the injunction must be denied. *Abbott Lab.*, 971 F.2d at 11. If the movant clears both hurdles, the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied, and (4) the public interest in the denial or grant of the preliminary injunction. *Abbott Lab.*, 971 F.2d at 11–12. The court must then weigh all four factors in deciding whether to grant the injunction. *Abbott Lab.*, 971 F.2d at 12. This "sliding scale" approach balances the degree of likelihood of success on the merits against the irreparable harms. The more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh in its favor. The less likely the plaintiff will succeed, the more the balance of irreparable harm must weigh in its favor. *Abbott Lab.*, 971 F.2d at 12. This weighing process also must consider the consequences to the public interest of granting or denying the injunctive relief. *Abbott Lab.*, 971 F.2d at 12.

■ In deciding whether Vencor has demonstrated some likelihood of succeeding on the merits, it is first necessary to decide what substantive law to apply to this dispute. In a diversity case, the choice of which state's substantive law to apply is determined by the conflict of law rules of the forum state. *Sarnoff v. American Home Prod. Corp.*, 798 F.2d 1075, 1080 (7th Cir.1986) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941)). In deciding whether the parties' choice of law provision will be enforceable in Illinois, the court must also apply Illinois' choice of law rules. *Sarnoff*, 798 F.2d at 1080. Illinois courts will allow parties to designate the law of another state if enforcement of such law is not dangerous, inconvenient, immoral, nor contrary to the public policy of Illinois. *Sarnoff*, 798 F.2d at 1081.

■ Here, the parties elected to have the agreement governed by Kentucky law. There is no apparent reason, and the parties have suggested none, that an Illinois court would find the noncompetition agreement to be against the public policy of Illinois. In fact, Illinois recognizes the enforceability of

such agreements under the appropriate circumstances. *See Sarnoff,* 798 F.2d at 1080. That an Illinois court might find this agreement violates Illinois law does not necessarily lead to the conclusion that it is so obnoxious to Illinois public policy that an Illinois court would refuse to enforce it, despite the parties' choice of Kentucky law. *See Sarnoff,* 798 F.2d at 1081. Finding the agreement unoffensive to the public policy of Illinois, this court will apply Kentucky law in deciding the extent to which it is enforceable.[4]

▉ The threshold question, then, is whether Vencor has shown some likelihood of proving at a subsequent trial that the non-compete agreement is enforceable against Webb under Kentucky law.[5] In Kentucky, an agreement in restraint of trade (such as the one at issue here) is reasonable if, under the circumstances of the particular case, the restriction is limited to affording fair protection to the interests of the employer and is not so broad as to interfere with the public interest or impose undue hardship on the party restricted. *Central Adjustment Bureau, Inc. v. Ingram Assoc., Inc.,* 622 S.W.2d 681, 684–85 (Ky.Ct.App.1981); *see Hammons v. Big Sandy Claims Serv., Inc.,* 567 S.W.2d 313, 315 (Ky.Ct.App.1978). A covenant not to compete with a former employer will be enforceable by way of injunction if it is valid and reasonable. *Louisville Cycle & Supply Co. v. Baach,* 535 S.W.2d 230, 232 (Ky.1976). Thus, reasonableness is the linchpin of any non-competition agreement under Kentucky law.

▉ Such agreements are valid and enforceable if the terms are reasonable in light of the surrounding circumstances. *Crowell v. Woodruff,* 245 S.W.2d 447, 449 (Ky.Ct.App. 1951). Reasonableness is to be determined generally by the nature of the business or profession and employment, and the scope of the restrictions with respect to their character, duration and territorial extent. *Crowell,* 245 S.W.2d at 449; *see Hall v. Willard & Woolsey,* 471 S.W.2d 316, 317 (Ky.Ct.App. 1971).

In the present case, the non-compete portion of the agreement prohibits Webb from working in a competitive business anywhere in the continental United States for twelve months after leaving Vencor.[6] This court need not address whether the geographic scope of the covenant is reasonable,[7] as the court finds the agreement unreasonable under the circumstances of this case and, thus, unenforceable against Webb.

Webb is an accountant. His position at THC is in billing and collections. There is no evidence to show that he took any confidential documents when he left Vencor. Although he was privy to certain financial documents and information contained therein,[8] there is no evidence that he has used any of those documents or information in his particular position at THC. Moreover, he denied doing so. While the evidence showed that Webb was involved in "straightening out" the financial operations at THC's hospitals in Texas and Florida,[9] there was again no evidence to show that Webb utilized any information he obtained at Vencor in doing so, other than general knowledge and experience.

4. The court notes that Kentucky case law in this area of the law is less defined than Illinois case law and the Kentucky appellate cases are somewhat dated. Nevertheless, Kentucky law has been chosen by the parties and will be applied.

5. Vencor conceded at the hearing that it is not seeking to enforce the confidentiality portion of the agreement.

6. Webb concedes the twelve-month period is reasonable.

7. The court notes, however, that Vencor has hospitals in twelve states and has drawn patients from at least sixteen other states, albeit usually from states in close proximity to the hospital. Furthermore, Vencor hospitals are located in the south, southeast, midwest and far west regions of the country. Vencor also has plans to expand into the northeast sector of the United States. THC operates in two metropolitan areas, as does Vencor. Even if the nationwide geographical scope of the covenant were too broad, the court may "blue pencil" the covenant to limit the scope. *See Hammons,* 567 S.W.2d at 315.

8. Webb concedes that the particularized information regarding Vencor's finances contained in the various documents was confidential.

9. Both are in the same metropolitan area as Vencor hospitals.

Furthermore, there is no evidence that Webb is in any position at THC that would allow him to utilize the information acquired while at Vencor.[10] At Vencor he was the assistant administrator of finance at one of Vencor's facilities. At THC, he is responsible for billing and collections. Without opining on the relative importance of the two positions, Webb's position at THC entails different duties and responsibilities. Webb's undisputed testimony was that he had no need to use any Vencor information and that such information had little, if any, bearing on his duties at THC. For example, Webb explained that the calculation of costs, which he performed at Vencor, is unrelated to collecting payments from Medicare, a function of his THC position.

Also bearing on the question of whether the non-competition agreement can reasonably be applied to Webb under these circumstances is the nature of the interest sought to be protected by the agreement.[11] The evidence here failed to show that Vencor had a proprietary interest in the format of the manuals or the financial documents used to operate its business to the degree necessary to impose a prohibition on Webb from working in the particular position he holds at THC. While several Vencor officials testified to the time, effort and money spent on developing the format of the manuals and documents, the evidence failed to show they were unique. Furthermore, McNaull, Webb's expert, testified that in his opinion the manuals and documents, while well-done, were not unique within the industry. Under Kentucky law, it would seem to be unreasonable to enforce an agreement not to compete against Webb where the interest sought to be protected is essentially a particularized

compilation of already existing and generally recognized principles and formulations into a different or more comprehensive format. This is especially so where there is no evidence to show the former employee is actually using, or in a position to use, that information to duplicate or recreate the final product of his former employer.[12] In so ruling, this court recognizes that financial information specifically pertaining to Vencor would be confidential to the extent it is not otherwise made available to the public. The confidentiality of such information is not sought to be enforced in this lawsuit, however.

Under these circumstances, the court finds that Vencor has failed to make a threshold showing of some likelihood of succeeding on the merits. Some likelihood, of course, means more than some chance. Vencor has not shown that it has any likelihood of succeeding in permanently enjoining Webb from working in his position at THC for the duration of the prohibited time period (twelve months). Absent that showing, this court must find in favor of Webb and deny the motion for preliminary injunction without further inquiry. *See Abbott Lab.*, 971 F.2d at 11.

■ Even if the court were to find that Vencor showed some likelihood of succeeding on the merits, it would nonetheless deny Vencor's motion under the remainder of the sliding scale analysis.[13] Under that approach, the more likely Vencor is to succeed on the merits, the less the balance of irreparable harms need weigh in its favor and vice versa. The court believes that if, in fact, Vencor has shown some likelihood of succeeding on the merits, it is slight. Thus, the

10. In pointing to the absence of evidence offered by Vencor, the court notes that while this is a motion for preliminary injunction the parties conducted substantial expedited discovery in this case.

11. The court notes at this juncture that Kentucky law is not particularly well-defined as to the precise factors to be considered by a court in determining the reasonableness of a particular non-competition agreement. The court, of course, cannot "create" Kentucky law by looking to factors that the Kentucky courts have not found relevant. Nevertheless, because Kentucky courts utilize a reasonableness standard, any rel-

evant factor bearing on that ultimate question, and not inconsistent with the policy reflected in the Kentucky law, may be properly considered.

12. Again, the court is careful to note that it does not find the lack of a proprietary interest to be, standing alone, dispositive of the enforceability question under Kentucky law.

13. The court considers the second threshold matter set forth in *Abbott Lab.*, the inadequacy of legal remedy and irreparable harm, to be met in this case.

 

balance of irreparable harms must weigh more heavily to justify a preliminary injunction.

The balance of irreparable harm is measured by weighing the irreparable harm Webb will suffer if the preliminary injunction is granted against the irreparable harm to Vencor if it is denied. In this case, Webb, a husband and father of three young children, will be out of a job. He also purchased a home in Atlanta, Georgia, as part of his accepting a position with THC. He will, of course, be left in a financial lurch should he be suddenly forced to quit his job. Furthermore, there is no guarantee that a position will be available for him a year from now at THC or that he will be able to return to THC.

On the other hand, Vencor has not identified what irreparable harm it will suffer under the particular circumstances here should the preliminary injunction not issue. Nor can this court perceive of any harm that Vencor might suffer in the time it might take to obtain permanent relief against Webb that would not be compensable by some reasonable means. Clearly, the balance of irreparable harm does not weigh so heavily in favor of Vencor, if at all, to outweigh the minimal showing of the likeliness of succeeding on the merits.

Additionally, this court must, in weighing these various factors, also consider the public interest, that is, the consequences of granting or denying the preliminary injunction to nonparties. *See Abbott Lab.,* 971 F.2d at 11–12. The public interest at stake if the injunction is granted is that of unnecessarily and unreasonably interfering with free enterprise and an individual's ability to work where he or she chooses. This is especially true because the agreement in this case has nationwide scope as written. More importantly, it is also against the public interest to force a person out of a job, possibly leaving him or her with no means to support themselves or their family. Additionally, Vencor's ability to disrupt the operations of THC will give it a distinct competitive advantage that will thwart to some degree the development of fair competition in an area of obvious public need, long-term health care. The other side of the coin is that for companies such as Vencor to efficiently and effectively deliver their services to the public they need to be able to protect critical and confidential material necessary to their operations.

In this case, there are identifiable effects on the public interest whether the preliminary injunction is denied or granted. As such, this factor carries little weight in the equation. When all the factors are weighed, the balance clearly tips in Webb's favor. Thus, even were the court to find that Vencor showed some likelihood of succeeding on the merits as a threshold matter, it would nonetheless deny the motion for preliminary injunction.

## CONCLUSION

For the foregoing reasons, Vencor's motion for a preliminary injunction is denied.